[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11401

_____

ANGELA M. POER,

Plaintiff-Appellant,

*versus*

JEFFERSON COUNTY COMMISSION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:19-cv-01361-AMM

_____

Before GRANT, ABUDU, and HULL, Circuit Judges.

ABUDU, Circuit Judge:

Angela Poer appeals the district court's grant of summary judgment in favor of her former employer, the Jefferson County Commission (the "Commission"), on her employment discrimination claims brought under Title VII (42 U.S.C. § 2000e *et seq.*), and 42 U.S.C. §§ 1981 and 1983.  Poer, a White woman, alleged in her complaint that her supervisor, a Black woman, discriminated against her based on her race, and that the Commission denied her request for a lateral transfer or reassignment to another department resulting in "disparate treatment."  She claimed that her ultimate termination was race-based, and she sought damages in the form of reinstatement and back pay among other forms of monetary and injunctive relief.  The district court determined that Poer had failed to present any evidence showing that she was terminated or otherwise discriminated against because of her race.  The court also declined to consider Poer's argument, raised for the first time at summary judgment, that the Commission's employment decisions were forms of retaliation in response to her grievances.

After carefully reviewing the record, and with the benefit of oral argument, we affirm the district court's judgment.

## I.    FACTUAL BACKGROUND

Poer joined the Commission's General Services Department as an Administrative Services Manager ("ASM") in October 2017.  Her duties included approving expenditures for all line items within the budget; preparing and monitoring monthly reports on credit cards; handling petty cash; overseeing operational and capital

budgets; purchasing equipment and supplies; supervising personnel by assigning and reviewing work; monitoring personnel performance; ensuring policies and procedures were followed by personnel; and training employees, among other tasks.

The Commission described the ASM role as a "fast paced position with a lot of moving parts," and stated that the ASM was responsible for managing a team of administrative clerks and accounting assistants in the department. Poer's direct supervisor, and the person she complains was chiefly responsible for her termination, was Trisha Wilkins, who is Black.

When Poer started the job, the Commission assigned Edwin Yergan, the Chief Administrative Analyst, as Poer's "start partner." Yergan was responsible for "acclimat[ing] [Poer] to the organization and provid[ing] guidance to successfully transition" her into the role. Almost immediately, according to the Commission, the management team identified problems with Poer's performance. The Commission's Director of the General Services Department, Jeff Smith, who is White, determined that Poer was receiving the necessary support to perform her duties, but that she was still "exhibiting signs of not getting along with her subordinates and struggling" to manage her team. As an example, he noted that an employee was removed from Poer's supervision after just three months of Poer being on the job because of a verbal altercation between the two of them. Poer, in response, maintained that the employee was difficult to manage and that on at least two occasions, she had informed Wilkins and the Commission's Equity and

Inclusion Department ("EID") of the employee's insubordinate be-havior.  Poer claimed that the EID never responded to her com-plaints and that Wilkins actively championed the employee, thus favoring her over Poer.

Poer was provided with a Training & OD Advisor, Tiffany Owens, to serve as Poer's professional coach.  Smith created a "New Employee Development Plan" to support Poer's professional development.

The Commission had a policy of evaluating employees who were in their probationary period every three months.  The perfor-mance scoring worked as follows:

A- "Below Expectations"

B- "Needs Improvement"

C- "Meets Expectations"

D- "Commendable"

E- "Exceeds Expectations"

Wilkins and Yergan conducted Poer's first evaluation in Jan-uary 2018.  Poer received two scores of "Needs Improvement," and four scores of "Meets Expectations."  She did not receive a score of "Exceeds Expectations" or "Commendable."  Yergan signed the evaluation form.  Poer signed the form and stated that she "agreed with it."

Poer had her second evaluation in April 2018 and received the following: (1) three scores of "Needs Improvement," two of which involved the same areas of concern identified in her first

evaluation; and (2) two scores of "Meets Expectations."[1]  She did not receive any scores of "Exceeds Expectations" or "Commendable."  The evaluation form, which Wilkins signed, explained that Poer "[i]sn't clear about who is responsible for what," "[d]oesn't provide work-in-progress feedback," is "disorganized," and "just throw[s] tasks at people"—among other concerns.  Poer signed the evaluation form, but she disagreed with the scores she received.  Although she believed she should have earned higher ratings, she did not explain why the scores were unjustified.

Poer received her third, and final, evaluation in July 2018.  Owens, Yergan, Smith, and Wilkins discussed the evaluation.  This time, Poer received "Needs Improvement" scores in eight categories: Compliance; Drafting Directives; Managing Details; Reviewing, Revising, and Maintaining Departmental Policies; Managing Payroll Computations, Customer Satisfaction, and Maintenance Tracking; Managing and Monitoring the Parking System; Encouraging Communication; and Purchasing Departmental Supplies.  She also received "Meets Expectations" scores in two categories: Establishing Onboarding Packets, and Assigning Work to Subordinates.  She did not receive any scores of "Exceeds Expectations" or "Commendable."  Poer signed the evaluation form, but she disagreed with the scores she received.  Although she believed she

---

[1] There are nine categories for which Poer was evaluated on for her three-month evaluation and six-month evaluation.  However, there are fourteen categories for which she was evaluated on for her nine-month evaluation.  Poer was not evaluated on all categories on any given evaluation (i.e., not every category was filled out).

should have earned higher ratings, she did not explain why the scores were unjustified. Wilkins also signed the evaluation form, and Poer stated in an affidavit that she believed that the low ratings were based, at least in part, on a misunderstanding regarding one of Poer's supply purchases.

On July 10, 2018, shortly after her nine-month evaluation, Poer requested a lateral transfer or reassignment from the General Services Department to the Equalization Board. She sent an email to the Commission's Chief Executive Officer, Tony Petelos, who is White, carbon copied Human Resources Director Michelle Rodrigues and stated:

> I am writing to request reassignment. I understand there is an opening for Administrative Services Manager with the Board of Equalization.

Poer acknowledged the lateral nature of the lateral transfer or reassignment request when she noted that she was "currently an Administrative Services Manager [same title] in General Services." She did not include a reason for her request, and she made no mention of being discriminated against by Wilkins.

Poer later testified that she "was trying to get out of the [General Services] department." Rodrigues's sworn affidavit supported Poer's statement that her motivation for requesting the lateral transfer or reassignment was to "get away from Trisha Wilkins." According to Rodrigues, Poer "had just received her 9-month appraisal and did not think it was a fair rating by Trisha Wilkins . . . and Jeff Smith . . . ." Though Poer cited unfairness, she did

not accuse Wilkins or anyone else in the Commission of discriminating against her based on her race at that time.

Rodrigues interpreted Poer's request as one for a "reassignment or transfer." Consequently, Rodrigues explained to Poer that because Poer was "in her probationary period-meaning she had been employed with Jefferson County Commission for less than a year [and] that she could not be transferred." Rodrigues told Poer that, in the event she was requesting a transfer, she was not eligible. Rodrigues informed Poer that if she wanted to be reassigned to another department, she could make that request directly to Smith. When Rodrigues spoke with Smith about Poer's interest in a reassignment, Smith responded that he could not recommend or support reassigning an employee with performance problems to another department. Therefore, according to the Commission, Poer was ineligible for a transfer due to her limited tenure on the job and was denied a reassignment because of her work performance problems.

According to Poer, her "email makes perfectly clear that [she] was asking for a reassignment." Poer contends that Rodrigues told her that she could not be "reassigned" because she was employed with the Commission for less than one year. Poer also referred to the request as both a "reassignment" and "lateral transfer" in her complaint.

Smith later stated in his affidavit that he "did not seek any input on [his] decision to refuse to give [Poer] [a] referral." Also, in its response to the formal Equal Employment Opportunity

Commission ("EEOC") charge that Poer subsequently filed, the Commission maintained that the denial of Poer's request for a re-assignment was based solely on her subpar performance.

Poer blamed Wilkins for the denial of her lateral transfer or reassignment request and alleged that Wilkin's actions were ra-cially motivated. Specifically, Poer claimed that she "was not reas-signed to [the Board of Equalization] because [Wilkins] did not like [her] because of [her] race." Poer's contention was based, in large part, on the fact that a Black employee, Tansy Long, was assigned to the Board of Equalization position that Poer had sought.

On or around July 10, 2018, Poer filed an internal complaint with the Commission's EID and Human Resources. She claimed that Wilkins engaged in "unfair treatment," but she did not accuse Wilkins of "racial discrimination."

Poer also claimed that Wilkins made several racially insensi-tive comments directed at her and other White employees and that, in general, Wilkins gave Black employees preferential treat-ment. The examples that Poer gave during her deposition were: (1) Wilkins asking her why a White person told a particular story, suggesting that Poer would know why because she is White; (2) Wilkins stating that "money did not need to be spent on [W]hite men because [W]hite men didn't want it spent on [B]lack people"; (3) Wilkins asking one of Poer's subordinates, who is Black, "Why did you let that [W]hite woman get to you[,] . . . you [are] a strong [B]lack woman ?"; and (4) Wilkins telling Poer that she would have problems managing Black female employees. Poer also alleged

that Wilkins told her that she "would have trouble managing Black female employees because [she] was a White female." According to Poer, another employee overheard Wilkins say, "if it were up to her, she would fire all of the [W]hite male managers." Overall, Poer contends that Wilkins was blaming her for staffing difficulties instead of recognizing that Poer's subordinates were actually the problematic ones. Poer asserted that Wilkins's comments and behavior made her fearful and anxious to the point where she started experiencing heart palpitations and had to increase her blood pressure medication.

Poer identified Smith, Yergan, and Barry Kennamer as witnesses to Wilkins's alleged racially discriminatory comments and conduct, but none of them corroborated her accounts. Smith affirmed in his affidavit that, "Poer never reported to me that she thought she was being discriminated against by Ms. Wilkins or anyone else in the department." Yergan attested that he "never witnessed or heard Trisha Wilkins say that [Poer] would have problems managing [B]lack women because she was [W]hite; [Wilkins] does not speak in that manner." Kennamer, in his affidavit, acknowledged that he was "personally not fond" of Wilkins, but he denied ever hearing Wilkins "make any racist statement," or say that "she would fire all the [W]hite managers." Although Kennamer disagreed with Wilkins's management style, he believed that she held "employees equally accountable across the board no matter what race or gender." Poer did not depose Smith, Yergan, or Kennamer, and she did not present any evidence either to substantiate her claims regarding Wilkins's alleged behavior, or to

impeach the managers' sworn statements. For her part, Wilkins also denied making any such comments and the Commission focused on Poer's failure to proffer testimony from any witnesses or other evidence to corroborate the alleged statements and mistreatment.

After her third performance evaluation, the Commission placed Poer on a Performance Improvement Plan ("PIP") in July 2018, which lasted until October 2018. The key areas that the Commission identified as needing improvement were "Time Management," "Timely Decision Making," "Decision Quality," and "Drive for Results." The PIP included a chart which broke down the specific steps Poer needed to take, including a minimum number of action items with projected results, for her to successfully complete the plan. The Commission informed her that it would formally evaluate her performance at the end of the plan period to determine how well she accomplished the plan's objectives. In addition, the PIP made clear that if her performance did not improve, she could face termination. Poer signed the PIP in August and her director, Jeff Smith, signed it in September.

While Poer was on the PIP, the Commission documented a couple of instances in which Poer did not properly secure the agency's funds. On one occasion, an employee reported to Wilkins that Poer mishandled money by leaving it on her desk exposed and unattended. Poer disputed the Commission's characterization that she "left money unsecured on more than one occasion." She explained that she left money behind a door that was closed and

locked in one case; and on another occasion, she left money behind a closed door, but the door's bolt was malfunctioning which is why the door was not locked.

Ultimately, the Commission determined that Poer's performance had not improved in the nine months she had been on staff, and especially during the following three months she was on the PIP. On October 3, 2018, Smith issued Poer a "Notice to Employee of Contemplated Disciplinary Action." The Notice was based on Poer's "unsatisfactory performance in probationary period" and "incompetence or inefficiency." Even though the Commission was not required to hold hearings related to the termination of an employee for poor performance during their probationary period, the Commission nevertheless granted Poer's request for one.

On October 12, 2018, while her disciplinary proceedings were pending, Poer filed a Charge of Discrimination with the EEOC against the Commission. In the section of the form labeled "Discrimination Based On," she only checked the "race" box, not the box for "retaliation" or any other basis. The EEOC issued its "Dismissal and Notice of Rights" in May 2019. The EEOC was "unable to conclude" that the Commission had violated federal employment laws.

On October 18, 2018, Petelos presided over Poer's disciplinary hearing. Petelos considered Poer's "entire work history" in reaching his ultimate decision to terminate her, including her reprimands and attendance record. He made particular note of the fact that she had approximately twenty-three days of absences

within the first year of her employment which Petelos determined was "unacceptable" and "worthy of her termination." He also considered Smith's recommendation to terminate her given that Poer "had left money unsecured on more than one occasion," among other things, which Petelos found was a sufficient basis for firing her as well.

Poer disputed Petelos's charge that she was "absent 23 days." Although Poer conceded that Smith's affidavit correctly reflected that she had total or partial "absences" on twenty-six days, she maintained that Wilkins approved many of those absences and, therefore, they should not have counted against her. She also later identified three Black employees—Sonya Moore, Rita Hutchins, and L'Tanya Blackmon—as alleged similarly-situated individuals who she claimed had job performance issues and yet were not disciplined.

The Commission officially terminated Poer on October 19, 2018, almost one year after she started the position. The person the Commission hired to replace Poer was a White woman.

## II.    PROCEDURAL HISTORY

In August 2019, Poer filed suit in the Northern District of Alabama and alleged that the Commission discriminated against her based on her race in violation of Title VII and 42 U.S.C. §§ 1981 and 1983. The gravamen of her complaint was that the Commission, primarily through Wilkins, subjected her to race-based disparate treatment which created a hostile work environment that included the improper denial of her "lateral transfer request" and her

unlawful termination.  The Commission first filed a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, which the district court denied.  After the parties engaged in discovery, the Commission moved for summary judgment on the ground that Poer failed to present a prima facie case of race-based employment discrimination.  The Commission further maintained that, even if she did satisfy the first part of the burden shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Poer had not met her burden of proof in showing that the reasons for the Commission's employment decisions were pretextual.

In opposition, Poer argued that the evidence created a genuine question of material fact to overcome the Commission's summary judgment motion, and that she presented sufficient evidence for a jury to find that the real reason she was fired was because of Wilkins' animus against White people.  In addition to relying on the *McDonnell Douglas* framework, Poer asserted that her claims could succeed based on a convincing mosaic of circumstantial evidence.  She accused the Commission of retaliating against her as evidenced by the timing between her internal grievances, her EEOC charge, and the agency's decisions to deny her lateral transfer or reassignment request and terminate her.  She also argued that she established a prima facie claim of hostile work environment.  Overall, because Poer disputed the Commission's representations regarding her work performance and the reasons given for her removal, she maintained that there were genuine issues of material fact to present to a jury.

14                    Opinion of the Court                    22-11401

After reviewing the evidence in the light most favorable to Poer, and weighing any factual disputes in her favor, the district court granted the Commission's motion. At the outset, the court ruled that Poer never included a retaliation claim in her complaint and did not otherwise provide the Commission with notice that such a claim was part of the litigation. Therefore, the court held, "the retaliation claim to which [] Poer alluded to in her opposition to summary judgment [was] not before the court." Although the district court described Poer's complaint as "not [being] a model of clarity," it did credit her repeated references to Wilkins's alleged race-based comments and how those comments "instilled fear and anxiety in Poer," as asserting a hostile work environment claim. The court then ruled that there was no direct evidence that supported Poer's racial discrimination claims, and the circumstantial evidence she introduced did not lead to a reasonable inference that her termination was racially motivated.

As to Wilkins's alleged discriminatory remarks, the district court found that those remarks, if actually made, pertained to "[W]hite male managers," not all White managers which would have included Poer; the statements "addressed hypothetical terminations," as opposed to any specific decision; and none of the statements were made by the management staff involved in the decisions around Poer's lateral transfer or reassignment request and termination.[2]

---

[2] During oral argument, Poer's counsel represented that Poer raised the "cat's paw" issue before the district court and on appeal. However, a close review

The district court also held that any circumstantial evidence Poer produced failed to support her assertion that the Commission's decision to end her employment was racially motivated. The court reasoned that the record did not include any similarly-situated employees who had been treated more favorably than Poer, and there was no evidence to corroborate those assertions.

Poer timely appealed the district court's judgment. On appeal, Poer does not challenge the district court's finding that she lacks the evidence of a comparator needed under the *McDonnell Douglas* analysis. Instead, her arguments on appeal are based on the court's purported failure to properly analyze the evidence supporting her claims under her convincing mosaic argument.

## III.    STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Munoz v. Selig Enters.*, 981 F.3d 1265, 1272 (11th Cir. 2020). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome of the suit under the governing law." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal quotation marks omitted). Accordingly, a genuine dispute of material fact exists where "the evidence is such

---

of Poer's brief reveals that she did not challenge the district court's decision regarding her "cat's paw" theory on appeal. That argument has, therefore, been forfeited. *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc).

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[T]he moving party has the burden of demonstrating that there are no genuine issues of material fact . . . ." *Paylor v. Hartford Fire Ins.*, 748 F.3d 1117, 1121 (11th Cir. 2014). In determining whether the movant has met this burden, we must view the evidence in the light most favorable to the non-moving party. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263–64 (11th Cir. 2010). We also must draw all reasonable inferences in the non-movant's favor. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011). However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The nature of a summary judgment movant's burden varies depending on which party would bear the burden of proof on a disputed issue at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Where a defendant moves for summary judgment on an issue for which it would not bear the burden of proof at trial, it is not necessary for the defendant to entirely negate the plaintiff's claim. *Id.* at 1115–16; *see also Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." (emphasis in original)). Instead, the movant "has the burden of either negating an

essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

Once a summary judgment movant's initial burden is met, "the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial." *Paylor*, 748 F.3d at 1121. "Overcoming that burden requires more than speculation or a mere scintilla of evidence." *Id.* at 1122. The non-movant must "go beyond the pleadings," to provide evidence and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). The non-movant will survive summary judgment in this instance if it can demonstrate "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Doe v. Drummond Co.*, 782 F.3d 576, 604 (11th Cir. 2015) (internal quotation marks omitted).

## IV.    DISCUSSION

Title VII prohibits employers from discharging an individual, or otherwise discriminating against that person with respect to her terms, conditions, or privileges of employment "because of" that person's race. 42 U.S.C. § 2000e-2(a)(1). Section 1981, likewise, forbids employers from intentionally discriminating against employees based on their race. *See Webster v. Fulton Cnty.*, 283 F.3d 1254, 1256 (11th Cir. 2002). Both Title VII and Section 1981 have the same burden of proof and use an identical analytical

framework. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023). A plaintiff may present either direct evidence, circumstantial evidence, or both to support a race discrimination claim. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).

Under the *McDonnell Douglas* framework, a plaintiff asserting a race discrimination claim under either statute must show that: (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly-situated employees outside her class more favorably. *McDonnell Douglas*, 411 U.S at 802; *Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) ("*Lewis I*") (en banc); *Knight v. Baptist Hosp. of Mia., Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam). If the plaintiff succeeds in making out a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reasons for its actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Lewis I*, 918 F.3d at 1221. If, at summary judgment, an employer meets its burden of articulating a non-discriminatory reason for any purportedly adverse action, "to avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993). A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

While the *McDonnell Douglas* framework is commonly employed when analyzing a Title VII or Section 1981 claim, it is only one method or evidentiary tool by which a plaintiff can prove discrimination by circumstantial evidence. *Tynes*, 88 F.4th at 946. A plaintiff who cannot satisfy the *McDonnell Douglass* framework may still be able to prove her case with a convincing mosaic of circumstantial evidence that would allow a reasonable jury to infer or find intentional racial discrimination in an adverse employment action. *See id.*; *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."); *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023) ("[T]he convincing mosaic metaphor offers an alternative to plaintiffs unable to succeed through the *McDonnell Douglas* framework."); *see also Berry*, 84 F.4th at 1310–11 ("[A] 'convincing mosaic' is a metaphor, not a legal test and not a framework."). Thus, unlike the necessary three-part test that Poer had to satisfy to succeed under the *McDonnell Douglas* framework, she could have introduced a variety of evidence which, as a whole, strongly suggested that the Commission's employment decisions were based on her race. *Smith*, 644 F.3d at 1328.

Among other things, a plaintiff may establish a convincing mosaic with evidence of "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn [;] (2) systematically better treatment of similarly-situated employees [;] and (3) that the

employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (internal quotation marks and citation omitted).

On appeal, Poer does not challenge the district court's ruling that she failed to establish a prima facie case of race discrimination under step one of the *McDonnell Douglas* framework, i.e., that she did not present any comparators to show that she was treated less favorably than similarly-situated employees. Instead, she argues that the district court erred in granting the Commission's summary judgment motion because she presented sufficient circumstantial evidence to support her Title VII and Section 1981 claims under the convincing mosaic evidentiary tool. She also contends that the district court impermissibly made credibility determinations and drew factual inferences that should have been left to a jury. Further, she asserts that the district court erred in finding that her complaint did not include a claim for retaliation. We address retaliation first.

### A. Retaliation

On appeal, Poer admits that she did not include a separate count or any specific allegations in her complaint raising a retaliation claim. She nonetheless argues that the Commission was on notice that she was challenging its conduct as a form of retaliation "given the multitude of references to her complaints to EID, termination, and demand for reinstatement present in both her complaint and the motion to dismiss briefing/Order." Poer contends that, like her hostile work environment claim (which she does not appeal), her complaint contained sufficient allegations to put the

Commission on notice that she was challenging its decisions as being retaliatory.  We agree with the district court that Poer cannot raise a retaliation claim for the first time at summary judgment, deny the Commission an opportunity to defend itself, and then expect a ruling on that issue.

A complaint must contain "a short and plain statement" of the claim. Fed. R. Civ. P. 8(a)(2).  Despite the liberal pleading standard for civil complaints, plaintiffs may not "raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam).  Instead, the proper mechanism to amend the complaint is to file a motion under Fed. R. Civ. P. 15, not "through argument in a brief opposing summary judgment." *Id*. at 1315.

Generally, a Title VII plaintiff must allege in her complaint that she has met the prerequisites of a valid and timely filed EEOC charge. *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 999, 1010 (11th Cir. 1982).  Here, the record shows that Poer did not assert a "retaliation" claim in her complaint.  Poer's charge of discrimination with the EEOC stated that "Wilkins inappropriately used her position of power to block [Poer's] transfer" and that she "was discriminated against because of [her] race in violation of Title VII," and her complaint alleged that she was "harmed by the Defendant's discrimination on the basis of the Plaintiff's race, as a [W]hite female . . . ."  Neither the EEOC charge nor her complaint addressed the purported retaliation claim.  Although Poer raised the issue of retaliation in her opposition to summary judgment, a

plaintiff may not "raise new claims at the summary judgment stage." *Gilmour*, 382 F.3d at 1314.

In addition, the district court's analysis of Poer's hostile work environment claim does not support her argument that she asserted a retaliation claim. Poer's complaint alleged that she sought a reassignment or lateral transfer that "would have removed her from the hostile work environment that Wilkins had created"; that "employees were fearful of Wilkins"; that Yergan commented, "it is a good thing for county employees to be afraid so that they would do their jobs"; and that "Wilkins'[s] comments instilled fear and anxiety in Poer to the point at which Poer was forced to increase her blood pressure medication and began to exhibit a startle reflex which resulted in heart palpitations." Therefore, the district court concluded that, even though there was no separate "hostile work environment" count in the complaint, the Commission was on notice that Poer was also complaining about being subjected to a hostile work environment. Poer's argument that she asserted a retaliation claim, in contrast, has no foundation in the complaint. She never used the term "retaliation," and she never alleged that her termination was, even in part, a direct result of her internal grievances and EEOC charge. Therefore, we agree with the district court that Poer did not allege a retaliation claim.

### B. Race Discrimination

Poer argues that she presented a convincing mosaic of circumstantial evidence to support her Title VII and Section 1981 claims. She presented the following: (1) disparaging comments

that Wilkins allegedly made to her and about other White employees; (2) the "inconsistent and shifting reasons" given for the denial of her lateral transfer or reassignment request; (3) evidence regarding alleged comparators; and (4) evidence regarding Wilkins' alleged mistreatment of employees, including Poer.

### i. Poer's Request for a Lateral Transfer or Reassignment

Poer asserts that the denial of her request for a lateral transfer or reassignment was based on Wilkins' racial animus against her. The Commission conceded in the district court that the denial of Poer's request for a lateral transfer or reassignment was an adverse employment action. However, as discussed below, she did not present enough evidence to overcome the non-discriminatory reasons the Commission gave for its decision. Nor did she tie any alleged racial animus to the final decision-makers on the lateral transfer or reassignment request.

### ii. Poer's Termination

The sole issue remaining is whether the district court erred in granting the Commission's motion for summary judgment as to Poer's claim that she was fired based on her race. In this regard, Poer contends that she presented a convincing mosaic of circumstantial evidence to create a genuine issue of fact as to whether the Commission's true motivation in terminating her was because she is White.

Contrary to her assertions, the district court did consider whether Poer had presented a convincing mosaic of circumstantial evidence to support her contention that her termination was race-

based.  In opposing summary judgment, Poer relied on the following circumstantial evidence: (1) Petelos's awareness, as the decision-maker, of Poer's complaints against Wilkins; (2) Petelos's knowledge that her request for a lateral transfer or reassignment was denied; (3) Wilkins's alleged racist comment about White people; and (4) the Commission's reliance on her absences to support her termination even though, she claims, the absences were approved.

The Commission, in its defense, offered several legitimate, non-discriminatory explanations for terminating Poer, a probationary employee who, within her first year, exhibited multiple performance issues, ineffectively managed her subordinates, left company money unsecured, and displayed interpersonal conflicts with her supervisor, co-workers, and subordinates.  These accounts were, in the business judgment of the Commission, worthy of termination and Poer has not offered any evidence to rebut the Commission's legitimate, non-discriminatory explanations for terminating her.  In other words, as part of her convincing mosaic argument, Poer has not shown any pretext.  *See Berry*, 84 F.4th at 1312-1313.

Even assuming that her absences should not have been held against her, Poer does not deny that she received multiple and repeated low ratings in her evaluations, that she had problems getting along with her subordinates and other co-workers, and that she left money unsecured on at least one occasion—all within a year of being on the job.  Instead of rebutting these non-discriminatory

reasons the Commission gave for terminating her, Poer offers only conclusory assertions about Smith and Petelos's motivations. Such generalizations are not enough to rebut the Commission's proffered reasons, nor do they create an inference of pretext. *See id.*

Poer also argues that "the district court . . . ignored properly articulated [Eleventh] [C]ircuit precedent requiring it to analyze Poer's mosaic of circumstantial evidence and pretext even when there is no comparator." The problem with Poer's argument is that the district court did consider each of the tiles in her mosaic and found the evidence to be unconvincing of racial discrimination considering the totality of the circumstances.

Poer heavily relies on *Jenkins v. Nell*, 26 F.4th 1243 (11th Cir. 2022), to support her contention that Wilkins's alleged racist remarks, alone, preclude summary judgment under her convincing mosaic argument. However, her reliance on *Jenkins* is misplaced because that case is materially distinguishable.

William Jenkins, a White crane operator sued his employer for race discrimination after his Black supervisor terminated him. *Jenkins*, 26 F.4th at 1246. There, we concluded that even though the plaintiff failed to make out a prima facie case under *McDonnell Douglas* for lack of comparators, he had successfully presented a convincing mosaic of race discrimination. *Id.* at 1249–51. The record evidence in *Jenkins* supported a reasonable inference that the supervisor engaged in racist behavior toward him and other White employees, and that a genuine issue of fact existed as to whether he was fired because of his race. In particular, Jenkins had

substantiated testimony from other employees regarding racial comments against White employees, evidence of mistreatment of White employees, and the termination of White employees for engaging in behavior that Black employees also exhibited without reprimand. *Id.* Moreover, the supervisor was the ultimate decision-maker who terminated Jenkins, and there was an otherwise inexplicable exodus of at least eighteen White employees under his management. *Id.* at 1246, 1251.

Unlike Poer, Jenkins could directly attribute the alleged racist comments that, again, others corroborated, to the undisputed sole decision-maker who terminated him. Overall, Jenkins presented much more evidence of discriminatory intent than what exists in Poer's case. Even crediting Poer's assertion that Wilkins made racist comments, and accepting her description of those comments as accurate, Poer did not tie Wilkins's alleged comments to the ultimate decision-makers—Petelos and Smith.

Because Wilkins did not make the final decision to fire Poer, and because Poer failed to tie any alleged comments Wilkins made to Petelos and Smith, *Jenkins* actually hurts her case as opposed to helps it. Therefore, the district court correctly determined that the evidence proffered did not create a triable issue as to discriminatory intent, and the Commission was entitled to summary judgment.

## VI.    CONCLUSION

Poer has not presented a convincing mosaic of circumstantial evidence that would support even an inference at summary judgment, let alone a jury finding at trial, that the Commission

22-11401                Opinion of the Court                27

terminated her because of her race.  We, therefore, **AFFIRM** the district court's grant of summary judgment in favor of the Commission.

**AFFIRMED.**