[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-10181

_____

JOSE R. ROSADO,

                                                        Plaintiff-Appellant,

*versus*

SECRETARY, DEPARTMENT OF THE NAVY,

                                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:19-cv-01428-MMH-PDB

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

ROSENBAUM, Circuit Judge:

In this case, we once again visit the unique proof requirements for federal-sector discrimination claims (versus private-sector discrimination claims). We've previously explained that, to state a claim, the texts of the federal-sector provisions of Title VII and the Age Discrimination in Employment Act ("ADEA") don't require a plaintiff to prove that unlawful discrimination was a but-for cause of adverse employment action. *Buckley v. Sec'y of Army*, 97 F.4th 784, 794 (11th Cir. 2024); *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1198 (11th Cir. 2021). And because a federal employee need not prove but-for causation, we've said that, to survive summary judgment, a federal employee doesn't have to satisfy the three-step *McDonnell Douglas*[1] framework. That's the framework we often use to assess but-for causation on circumstantial-evidence claims of discrimination under the private-sector provisions of Title VII and the ADEA. *Buckley*, 97 F.4th at 794-95. Rather, a federal employee must show only that unlawful discrimination "play[ed] any part" in the challenged employment decision. *Id.* at 798.

Plaintiff-Appellant Jose Rosado, who worked for the United States Navy, argues that a federal employee can satisfy that requirement by making out a prima facie case of discrimination at *McDonnell Douglas*'s first step. But that's a question we don't answer today. Even if a federal-sector employee can carry his burden by establishing a prima facie case alone, Rosado hasn't done so here for any of

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

the five employment decisions he challenges.  So we affirm the district court's grant of summary judgment for the Navy, and we leave for another day whether a prima facie case alone is enough for a federal employee to survive summary judgment on his claims of discrimination under Title VII and the ADEA.

Rosado also appeals the district court's entry of summary judgment for the Navy on his retaliation claims under Title VII and the ADEA.  But there, we conclude that if a federal employee establishes a question of fact as to whether he has satisfied a prima facie case of retaliation, he does enough to defeat summary judgment.  That said, Rosado hasn't.  So we affirm the district court's grant of summary judgment for the Navy on his retaliation claims as well.

## I.    BACKGROUND

A.    Facts[2]

  *1. Rosado*

Jose Rosado is a Hispanic male whose national origin is Colombian.  In 2014, when Rosado applied for and was denied the promotions we discuss in this opinion, he was over the age of sixty.

In 2007, Rosado took a job as an Information Technology ("IT") Specialist with the Naval Facilities Engineering Command,

---

[2] Because we are reviewing a summary-judgment order, we set forth the evidence in the light most favorable to the nonmoving party—here, Rosado. *Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1246, 1251 (11th Cir. 2023).  As a result, the actual facts may or may not be as stated.

Southeast ("NAVFAC SE"), in Jacksonville, Florida, in the Command Information Office ("Command Information"). Before that, Rosado had held other electronics and IT positions as a civilian employee of the Navy, and he had spent twenty years in computer and electronic positions at the Marine Corps Communications Electronics School.

As the Navy describes it, Command Information at NAVFAC SE has four sections or divisions: CIO1, CIO2, CIO3, and CIO4. Rosado worked in CIO3, the division that handles customer support, provides technical expertise, and manages equipment like computers and wireless and landline devices.

Rosado asserts that the Navy discriminated against him in denying him a promotion five times: August 2014 (Decision 1), December 2014 (Decision 2), January 2015 (Decision 3), September 2015 (Decision 4), and January 2018 (Decision 5). We discuss each of these decisions in more detail in Section III of this opinion.

Based on the denials of promotion and other circumstances predating them, Rosado filed complaints of discrimination with the Equal Employment Opportunity Commission ("EEOC"). He also asserted the Navy retaliated against him for making these complaints.

On October 14, 2011, Rosado first alleged violations of the Equal Pay Act and of Title VII on the basis of sex. The Navy forwarded the complaint for investigation in 2012, and the EEOC processed it in 2013. The first promotional decision Rosado challenges here occurred after that complaint, in August and September 2014.

23-10181                Opinion of the Court                5

Rosado then filed formal EEOC complaints in December 2014, April 2015, and March 2018 about selections for some positions at issue.

### 2. Command Information's Competitive Hiring Process

Andrea Freeman was the Command Information Officer and Rosado's second-level supervisor. Beginning September 7, 2014, she managed the three divisions of the Command Information Office in NAVFAC SE and then immediately created and oversaw the fourth division—CIO4.

Freeman explained that the competitive hiring process at Command Information typically includes three steps after applicants apply. First, human-resources staff eliminates from the applicant pool each applicant whose résumé fails to satisfy the necessary job requirements. When they're done, human-resources staff sends the remaining application packages to a selection panel. Second, the selection panel for the position scores the applicants' résumés. Résumé reviewers grade candidates based on only the information their résumés contain—not on any personal knowledge. And in scoring applicants' résumés, reviewers use position-specific pre-established scoring criteria. Third, the selection panel interviews the highest-scoring candidates and assigns interview scores. As with the résumé-review process, interviewers score interviews based on pre-established criteria.

### B.    Procedural History

In December 2019, Rosado sued the Secretary of the Department of the Navy. The operative complaint here, the Amended

Complaint, asserts several counts under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the ADEA, 29 U.S.C. § 621, *et seq.* Rosado alleged discrimination on the bases of his race, national origin, and age, and in retaliation for his complaints of discrimination.

After discovery, the Navy moved for summary judgment. The Navy contended that it made the promotional decisions about Rosado free from discrimination and retaliation for Rosado's opposition to discrimination. Rosado opposed the motion for summary judgment. He contended that he was the "best qualified candidate based on his background, experience, knowledge, skills, and ability."

After considering the motion, the district court entered summary judgment for the Navy on all claims. The district court concluded that Rosado failed to present a prima facie case of discrimination or retaliation as to any of his claims.

Rosado now appeals.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). Summary judgment should be granted when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. *See id.*; *see also* Fed. R. Civ. P. 56(a). On a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party. *Anthony*, 69 F.4th at 804. A genuine issue of material fact exists if a reasonable jury could return a verdict for

the non-movant. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284–85 (11th Cir. 1997). When we make this determination, "a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc).

## III.    DISCUSSION

Rosado challenges the district court's grant of summary judgment on his claims for (1) race-, national origin-, and age-based discrimination and (2) retaliation for his protected EEO activity. We divide our discussion into two major parts. First, we review the legal framework that governs federal-employee Title VII claims of discrimination based on race and national origin, and ADEA claims of discrimination based on age. Within that section, we consider the viability of Rosado's race-, national origin-, and age-based discrimination claims about each of the five promotion decisions Rosado challenges. Second, we discuss the legal framework that governs federal-employee retaliation claims under Title VII and the ADEA. And within that section, we consider each of Rosado's claims for retaliation.

A.    <u>Rosado did not present enough evidence to defeat summary judgment on his claims of disparate treatment based on race, national origin, or age.</u>

We begin by reviewing the legal framework that applies to federal employees' claims of disparate treatment under Title VII and the ADEA.

Federal employees' claims of race- and national origin-based disparate treatment arise under 42 U.S.C. § 2000e-16(a), Title VII's federal-sector provision. As relevant here, that statute provides that "[a]ll personnel actions affecting employees . . . in military departments . . . shall be made free from any discrimination based on race . . . or national origin."[3] *Id.*

As for federal employees' claims of age-based disparate treatment, 29 U.S.C. § 633a(a) of the ADEA governs those.[4] Section 633a(a)'s text is identical to § 2000e-16(a)'s, except for the group it protects. Under § 633a(a), "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a).

Since the relevant provisions of Title VII and the ADEA are "materially identical," we have construed them the same way. *Babb*

---

[3] Section 2000e-2(a) of Title 42 contains the private-sector version of this provision. Among other things, that statute makes it "an unlawful employment practice for an employer to" take personnel action against an employee or refuse to hire an applicant "because of such individual's race . . . or national origin[.]" *Id.* § 2000e-2(a)(1). So unlike with the federal-sector provision, under the private-sector statute, an employee must show that race or national origin was the but-for cause of the challenged personnel action to establish a claim. *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) (explaining that § 2000e-2(a)(1)'s "'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation"); *see Babb v. Wilkie*, 589 U.S. 399, 410 (2020) (describing "because of" as "but-for causal language").

[4] That includes employees of the Department of the Navy. 29 U.S.C. § 633a(a); 5 U.S.C. § 102.

*v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1198 (11th Cir. 2021) ("*Babb II*"). Both provisions "demand[] that personnel actions be untainted by *any* consideration" of the protected basis—race and national origin (as relevant here) under Title VII, and age under the ADEA. *Babb v. Wilkie*, 589 U.S. 399, 402 (2020) ("*Babb I*") (opining on the ADEA) (emphasis added); *Buckley*, 97 F.4th at 793 (explaining that this same analysis applies to the Title VII federal-sector provision).

So to survive summary judgment, neither provision "require[s] proof that an employment decision would have turned out differently if [the protected basis] had not been taken into account." *Buckley*, 97 F.4th at 793 (citation and internal quotation marks omitted). Rather, "a federal employer violates the law if it allows [the protected characteristic] discrimination to contribute to any personnel action—even if the federal employer would have made precisely the same decision had it not engaged in [the protected characteristic] discrimination." *Id.*

Because a federal employee need not establish but-for causation for employment action he challenges, we've explained that a federal employee need not satisfy the *McDonnell Douglas* framework to defeat summary judgment. *Id.* at 794.

The *McDonnell Douglas* framework, which private-sector employees relying on circumstantial evidence may use to establish a violation of Title VII or the ADEA,[5] is a three-step burden-shifting

---

[5] Of course, private-sector employees relying on circumstantial evidence can survive summary judgment without using the *McDonnell Douglas* framework.

analysis. It's designed to establish that unlawful discrimination served as the but-for reason for an employer's personnel action.

Under the *McDonnell Douglas* framework, at step one, the plaintiff has the burden of setting out a prima facie case of discrimination by showing (1) he belonged to a protected class, (2) he underwent an adverse employment action, (3) he was qualified to perform the job, and (4) his employer treated similarly situated employees outside his protected class better than it treated him. *Id.* If a plaintiff fulfills that burden, at the second step, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer satisfies the second step, at the third step, the employee must then establish that the employer's stated reason was merely a pretext for unlawful discrimination. *Id.* Ultimately, the plaintiff must carry the burden of showing that "discrimination was the but-for cause of [his] employer's adverse personnel action." *Id.*

But as we've explained, the federal-sector discrimination statutes don't require a federal employee to establish but-for

---

To do so, they must present "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (citation and quotation marks omitted). A plaintiff may show a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker" by relying on evidence showing, "among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id.* (cleaned up).

causation for the challenged action. Rather, for a federal employee to defeat summary judgment, he must show only that the protected characteristic "played *any* part" in the employer's decision-making process when the employer engaged in the challenged action. *Id.* at 795 (cleaned up). Of course, if a federal employee wishes to use the *McDonnell Douglas* framework to state a claim, he may continue to do so. It's just that *McDonnell Douglas* imposes a heavier burden than a federal employee must satisfy. *Id.* at 794–95.

That said, some of our unpublished decisions have suggested that a federal employee may survive summary judgment by satisfying the *McDonnell Douglas* first step—that is, by making out a prima facie case of discrimination. Those decisions are, of course, not binding. But in this area of law, which is still relatively immature given the Supreme Court's 2020 *Babb I* decision, we can understand why a district court might have looked to them for guidance.

Even so, we do not consider today whether a federal employee may choose to rely solely on a prima facie case to establish a violation of Title VII or the ADEA. We save that question for another day because its answer cannot affect the outcome here. So for purposes of this opinion, we assume without deciding that establishing *McDonnell Douglas*'s first step—the prima facie case—is enough for a federal-sector employee to defeat summary judgment on a Title VII or ADEA discrimination claim.

Even if a prima facie case alone is always enough to survive summary judgment, for the reasons we explain below, Rosado has not established a prima facie case of discrimination for any of the

Navy's challenged promotion decisions. Nor has Rosado otherwise shown that discrimination on the bases of race, national origin, or age "played any part" in those decisions.

For each of his challenged promotion decisions, Rosado argues that, in determining whether he had established a prima facie case, the district court erred by considering the relative qualifications of his competition. In fact, Rosado claims he did not have to present any comparator information at all to establish a prima facie case. Relying on this Court's decision in *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998), Rosado asserts he had to show only that (1) he is a member of a protected class; (2) he applied for and was qualified for the job sought; (3) he was not chosen for the position; and (4) the Navy filled the position with a person outside his protected class. *Id*. at 1186, 1192. We disagree.

To be sure, *Walker* says that a plaintiff need not present comparator evidence to sustain his prima facie case. *See id*. at 1193 ("[a]lthough a plaintiff may be forced to address relative qualifications if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then. . . ."). But that aspect of *Walker* is no longer good law. Since we issued *Walker*, we have determined, while sitting en banc, that "[u]nder [the *McDonnell Douglas*] framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by proving, among other things, that [he] was treated differently from another similarly situated individual—in court speak, a comparator." *Lewis v.*

*City of Union City,* 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc) ("*Lewis I*") (citation and internal quotation marks omitted).

In fact, in *Lewis I*, we rejected the same argument Rosado raises—that the comparator analysis is not a necessary part of a plaintiff's prima facie case. *Id.* at 1221, n.7 and 1223, n.9 (rejecting the contention that the analysis of comparators should be relegated to the pretext stage of the *McDonnell Douglas* framework). So our statement in *Walker* that excused a plaintiff from presenting comparator evidence cannot help Rosado. *See Stanley v. City of Sanford*, 83 F.4th 1333, 1338 (11th Cir. 2023) ("Under the prior-panel-precedent rule, we are required to follow the precedent of the first panel to address the relevant issue, *unless and until the first panel's holding is overruled by the Court sitting en banc* or by the Supreme Court.") (emphasis added) (citation and internal quotation marks omitted). And while *Lewis I* isn't a failure-to-promote case, we were "clear[] [that] the 'similarly situated in all material respects' standard that we embrace[d] [there] applies to all discrimination claims pursued under *McDonnell Douglas*." *Lewis I*, 918 F.3d at 1226, n.11.

As for our specific take on a failure-to-promote claim under the *McDonnell Douglas* framework, we've said that a plaintiff establishes a prima facie case of discrimination by showing that "(1) [he] is a member of a protected class; (2) [he] was qualified and applied for the promotion; (3) [he] was rejected despite [his] qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted." *Wilson v. B/E*

*Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004) (citing *Lee v. GTE Fla., Inc.,* 226 F.3d 1249, 1253 (11th Cir. 2000)).

So to the extent that we construe Rosado's argument to contend that, for purposes of federal-employee discrimination claims, a plaintiff should not have to show comparator evidence to survive summary judgment, our answer to that is a well-known lawyer answer: it depends. If the federal employee also has evidence to show that discrimination "played any part" in the decision-making process, we agree that nothing requires a federal employee to present comparator evidence. But assuming a prima facie case of some type is alone enough to sustain a federal employee's discrimination claim, that prima facie case must reasonably allow for an inference that discrimination figured into the decision-making process in some way. And even if a prima facie case gets us there—a question we don't answer today—the *Walker* prima-facie-case elements don't.

We have said that "discrimination consists of *treating like cases differently*." *Lewis I*, 918 F.3d at 1222 (citation and internal quotation marks omitted). So "[b]y its very nature, . . . discrimination is a comparative concept—it requires an assessment of whether 'like' (or instead different) people or things are being treated 'differently.'" *Id.* at 1223. But the *Walker* prima-facie-case elements—that (1) Rosado is a member of a protected class; (2) he applied for and was qualified for the job sought; (3) the Navy did not select him the position; and (4) the Navy filled the position with a person outside his protected class—don't leave us any way to determine that "'like'

. . . people . . . are being treated 'differently,'" *id*.  In other words, the mere fact that someone outside the protected class received a promotion that a qualified person in the protected class didn't doesn't allow us to infer that unlawful discrimination "played any part" in the process that led to that decision.  After all, it doesn't give us enough information to conclude that "'like' . . . people . . . [were] being treated 'differently,'" *id*.—even in the decision-making process.

But if the protected-status plaintiff and the non-protected-status selectee were "similarly situated in all material respects" yet the employer promoted only one, we know that "'like' . . . people . . . [were] being treated 'differently.'"  And that leaves only the question of why.  To be sure, something as innocuous as, say, savings the employer might incur by hiring the non-protected-status applicant may fully explain the difference.  Then again, discriminatory animus may have played a role in the decision-making process.  *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981) ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.").

So if a federal employee may overcome summary judgment by establishing a prima facie case of discrimination under the *McDonnell Douglas* framework, that prima facie case must include "meaningful comparator analysis."  *See Lewis I*, 918 F.3d at 1224.  "Meaningful comparator analysis" requires a showing that the plaintiff and his comparators are "similarly situated in all material

16                    Opinion of the Court                    23-10181

respects." *Id.* at 1226. As we explain below, Rosado has failed to present "meaningful comparator evidence," so he has not established a prima facie case of unlawful discrimination for any of the five decisions he challenges. Nor has Rosado otherwise shown that unlawful discrimination "played any part" in his nonselection.

> 1. *Rosado failed to establish a prima facie case of unlawful discrimination or to show that unlawful discrimination otherwise "played any part" in the Navy's decision-making process for Decision 1.*

We begin with Decision 1. In Decision 1, the Navy decided not to promote Rosado to an IT Specialist position in CIO3 with pay at a GS-12 level[6] in August and September 2014. Instead, the Navy selected Lewis Fleming, a white male in his thirties, for the position. Rosado alleges that the Navy did not choose him for the position because race, national origin, and age discrimination played a role in the selection process. We disagree that the evidence Rosado presents establishes that.

According to the job posting, the position's duties included installing and configuring network servers, operating systems, routers, and switches, as well as industrial control systems. The posting required applicants' résumés to provide evidence of sufficient experience, knowledge, education, and skills to perform the

_____

[6] The General Schedule ("GS") payscale determines the salaries of most civilian government employees. GS-12 is the twelfth paygrade in the GS payscale. GS-12 Pay Scale – General Schedule 2021, (last accessed February 3, 2025), https://federalpay.org/gs/2021/GS-12 [https://perma.cc/4DK4-TCDU]

duties.

The selection panel for the position consisted of Scott West, Luke Guthrie, Jeff Kohler (the Command Information Officer who preceded Freeman), and a non-voting EEO member (Rhonda Grimes). West and Guthrie were unaware of Rosado's age, date of birth, national origin, or prior EEO activity. West assumed Rosado was Hispanic, but Guthrie was unaware of Rosado's race.

The Navy found Rosado and sixteen others to be qualified for the position. But the panel did not interview Rosado because during the screening process, Rosado's résumé did not score high enough. To determine résumé scores, the panel assigned points to the seventeen resumes based on the following criteria: Windows server/workstation operating systems experience, network administration experience, switch and router configuration experience, industrial control systems experience, and wireless network configuration experience.

Rosado's résumé ranked eleventh of the seventeen applicants who applied. The panel awarded Rosado 29.00 points on his résumé, while it gave Fleming 39.67. In all but the first category, the panel ranked Rosado and Fleming similarly, so without the first category, Rosado received 57 points and Fleming 59. But the first category made the difference. There, Fleming scored higher for his experience in Windows server/workstation operating systems and wireless network configuration. While Rosado received 30 points, Fleming scored 60. All three panelists scored the men similarly. So Rosado didn't get an interview. Meanwhile, when Fleming

interviewed, the panel awarded him 57.67 points and scored the other two interviewees lower. Then the panel recommended Fleming and another individual for the position on August 4, 2014, because they received the highest scores of the interviewees who remained interested in the position.

Rosado contends he was more qualified than Fleming. He bases this conclusion on a few assertions: according to Rosado, (1) he had more years of NAVFAC and overall IT experience than Fleming; (2) Rosado had all the required certifications for the job, and Fleming did not; (3) after Fleming got the position, he was transferred to Rosado's branch and Rosado helped train him; and (4) Fleming had little industrial-control-systems experience.

But the record shows that the panel saw things differently. Though Rosado may have had more years of certain types of experience, it wasn't the type of experience that counted the most. Indeed, all panel members awarded Fleming far more points on his résumé and a higher rating in operating systems and wireless network configuration. And Guthrie pointed out that Rosado lacked as "much recent significant experience" as Fleming.

As for Rosado's certifications, even Rosado recognizes that the Navy's policy allowed Fleming 24 months to obtain these certifications.

We also can't say that the fact that Rosado helped train Fleming in some areas establishes that Rosado was better qualified for the particular position he sought.

Turning to Rosado's contention that Fleming later said he didn't know anything about industrial control systems, that does not help Rosado, either. In the industrial-control-systems experience category, both Rosado and Fleming received only 2 points out of 30 points. In other words, as the panel saw things, Rosado and Fleming lacked this particular experience to an equal degree. Yet Fleming had more experience with window servers and workstation operating systems. Rosado doesn't dispute this.

For these reasons, Rosado failed to show that Fleming was similarly situated to him in all material aspects. Nor does Rosado point to any evidence that suggests that discrimination tainted the panel's decision in any way. In fact, two of the three members of the panel didn't know Rosado's national origin or age, and one of those two members also did not know Rosado's race. Based on the record, Rosado failed to raise an issue of fact as to whether Fleming was just as or less qualified than he was for the position. So we affirm the district court's grant of summary judgment for the Navy with respect to Decision 1.

2. *Rosado failed to establish a prima facie case of unlawful discrimination or to show that unlawful discrimination otherwise "played any part" in the Navy's decision-making process for Decision 2.*

Decision 2 is unique; it didn't involve a job posting or a formal competitive process. Rather, in December 2014, Freeman converted temporary employee Leon Ravenscroft to a permanent employee.

At the time, Ravenscroft was working in a term position as an IT Specialist in CIO3 and sought to be converted to permanent status. As a veteran with a 30% or more disability rating, Ravenscroft was "entitled to a significant veterans' preference" for employment. So after Ravenscroft asked, Freeman consulted human-resources staff and determined Ravenscroft was eligible for noncompetitive conversion to a permanent position if he had satisfactorily performance and he passed a background investigation.

Ravenscroft performed above the satisfactory level and had provisional clearance as a temporary employee. He also had extensive experience in industrial control systems, with experience managing power control and heating, ventilation, and air-conditioning (HVAC) systems. Besides that, Ravenscroft had run a business that installed and troubleshot industrial control systems for nine years—from 2004 to 2013. Based on these factors, Freeman offered Ravenscroft a position on December 19, 2014, converting him from a temporary IT Specialist in CIO3 to a permanent IT Specialist in CIO4 at a higher pay grade (GS-12).

Rosado complains he didn't receive an opportunity to compete for the higher-paid IT specialist position, which he learned about on June 26, 2015. In Rosado's view, Freeman should have filled the position using a selection panel. Her failure to do so, Rosado alleges, discriminated against him on the bases of race, national origin, and age.

We disagree and conclude that Rosado failed to establish a prima facie case for Decision 2. The circumstances of Ravenscroft's

"promotion" just don't support an inference of discrimination. While Rosado claims he was more experienced than Ravenscroft, he does not dispute that Freeman was permitted under the Navy's policies to non-competitively promote Ravenscroft. And regardless of Rosado's qualifications, he and Ravenscroft were simply not similarly situated in all material aspects. *See Lewis I*, 918 F.3d at 1231. True, Rosado had been employed at NAVFAC SE longer, but that wasn't material, given that Rosado didn't show he had equal or better qualifications in industrial control systems, a skillset important to the position. By comparison, Ravenscroft had significant industrial-control-systems experience. And Ravenscroft's circumstances were unique—he was veteran with a 30% or more disability rating, entitling him by law to a veterans' preference. Rosado was not entitled to this preference.

Nor does Rosado point to any evidence that suggests that unlawful discrimination "played any part" in Freeman's decision to non-competitively promote Ravenscroft.

In sum, Rosado has not presented a triable issue of fact on whether unlawful discrimination "played any part" in Freeman's decision to promote Ravenscroft. We therefore affirm the district court's grant of summary judgment on Decision 2.

> 3. *Rosado failed to establish a prima facie case of unlawful discrimination or to show that unlawful discrimination otherwise "played any part" in the Navy's decision-making process for Decision 3.*

Rosado applied for another GS-12 IT Specialist position in

CIO4 in late December 2014 or early January 2015. For Decision 3, Freeman asked Charlie Weaver to oversee the selection panel. Weaver (who served as a witness in support of one of Rosado's other EEO complaints) used five criteria to establish eligibility for the position: (1) project management experience, (2) technical experience, (3) network experience, (4) industrial-control-systems experience, and (5) certifications/education.

Based on these criteria, Rosado was eligible for this position. But Rosado found himself in good company. Too good, in fact. Because the certified list of those who met the initial criteria numbered forty, Weaver further pre-screened the eligible candidates to reduce the pool to a more manageable size for the panel members to review. In the second round of pre-screening, Weaver first determined that experience with, and technical experience related to, industrial control systems was particularly important. And then he assessed the eligible applicants using these seven criteria to further reduce the list of forty eligible candidates: (1) advanced metering infrastructure; (2) programming language controls; (3) supervisory control and data acquisition ("SCADA"); (4) dynamic delta controls; (5) industrial control systems; (6) Enclave; and (7) public safety network. This yielded a list of seven candidates.

Weaver chose Wayne Powell, Leon Ravenscroft, and Hugh Hicks to serve on the selection panel.

After applying the second-round screening criteria, Weaver determined that Rosado's résumé didn't score high enough to move on to the next phase. He noted Rosado's résumé didn't list

23-10181　　　　　　Opinion of the Court　　　　　　　23

industrial-control-systems experience, lacked current systems and networking experience, contained outdated IT terminology, and failed to list some functions Rosado did while working in CIO3. And while Rosado's résumé reflected his position in CIO3, that position dealt mostly with cell phones and telephone networks and systems. In Weaver's view, that experience was not only unrelated to the telecommunication-services duties the person hired would have, but it was outdated, having occurred more than seven years earlier—before November 2007.

Of the seven résumés that passed Weaver's review, the selection panel evaluated and assigned scores to five because two individuals had since become unavailable. The panel and Weaver ranked the résumés and then offered interviews to the top three candidates. Each of the three either declined an interview or a job offer.

At that point, the recruiting process had lasted months with no results. To avoid having to restart the hiring process—because the existing list of eligible candidates was due to expire on March 16, 2015, and the work was piling up in CIO4—Freeman and Weaver selected for the position from the existing certification list of the forty applicants, focusing on the remaining top ten candidates. And because they were struggling to find candidates with industrial-control-systems experience, Freeman and Weaver realized they would probably need to train anyone hired.

Of those top ten candidates remaining on the list, several were no longer available. But the two highest-ranking candidates

were available.  They included Greg Snead, who was ranked fourth on the list, and Anthony Joshua, who was ranked ninth.  Snead had been one of the top candidates from the start, and he even had some industrial-control-systems experience on his résumé, so Freeman and Weaver agreed on Snead for one of the positions.  As for the other position, Weaver favored Joshua.  He explained that though Joshua lacked industrial-control-systems experience, he had experience in current systems and networking systems, which showed he could be trained in industrial control systems.  With Weaver's recommendation, Freeman selected Snead and Joshua on March 11, 2015, for the two CIO4 positions.

Rosado protests that the selection panel never interviewed either Joshua or Snead.  He also contends he had industrial-control-systems experience.  And he notes he mentioned that experience on a questionnaire included with his application, even though he didn't list the experience on his résumé.  In sum, he says he was better qualified for the position than Joshua and Snead were.  We disagree.

To be sure, Rosado established the first three elements of a prima facie case.  First, he was qualified for the job, as the fact that Rosado's résumé passed through the initial review shows.  Second, the Navy didn't select Rosado for the position, and third, the two men selected were outside Rosado's protected class.  Joshua is Black and was under the age of 40 at the time of the decision.  And Snead is white, though he was over the 40 at the time.  But once again, Rosado has failed to show that the Navy treated similarly situated

comparators better because he hasn't established that Snead and Anthony were just as or less qualified for the position than he was.

Freeman and Weaver said the most important experience for the position was industrial-control-systems experience. Rosado does not refute this. And although he asserts he had more such experience than Joshua, he did not show that either Freeman or Weaver *knew* of the experience.

True, Rosado mentioned on a USAJOBS.gov questionnaire that he had performed industrial-control-systems functions. But only human-resources personnel saw this information as part of the process to certify the list of applicants. After that, human-resources personnel did not pass along the questionnaires with the résumé packages it provided to Weaver, Freeman, or the selection panel. And Rosado's résumé mentioned nothing he listed on the questionnaire that would have informed Weaver and the rest of the panel of his industrial-control-systems qualifications.

Not only that, but Rosado admitted that he knew he needed to list any relevant qualifications or experience on his résumé so the selection panel could take that into consideration. That system was by design. The résumés had to contain the relevant qualifications and experience so the panel members could not show favoritism to the individuals they knew. Yet Rosado presents us with nothing to show that his résumé identified any such experience. And even if the panel could have considered information from outside the résumés, Rosado points to nothing to show Weaver knew about Rosado's industrial-control-systems experience when he screened the

résumés the second time around or that the panel knew of that experience.

As for Snead, his résumé scored higher than Rosado's and reflected some industrial-control-systems experience, along with systems and network experience. Given that Rosado's résumé identified no industrial-control-systems experience, Snead appeared better qualified, and Rosado can't meet the last prong of his prima facie case.

Next, we turn to Joshua. Like Rosado's, Joshua's résumé also reflected a lack of industrial-controls-system experience. But Weaver ranked Joshua higher than Rosado because the experience Joshua did list—more extensive and more current systems and networking experience than Rosado's—caused Weaver to conclude that Joshua could be more quickly and efficiently trained in industrial control systems. Indeed, Joshua's résumé reflected that he worked with systems and networks daily through 2014, and his then-current position required him to use the Command Information intranet network in particular. By contrast, Rosado's résumé showed he gathered most of his experience in systems and networks earlier in his career—between 2004 and 2007. The upshot of this comparison is that, for the skills the Navy needed, Joshua was more qualified than Rosado.

Nor does the record reveal that unlawful discrimination tainted the decision-making process in any way. Rosado argues that Freeman showed age bias by remarking that Rosado's résumé contained outdated terminology. But on this record, we disagree that

Freeman's comment exhibited age bias. Rather, Rosado's use of outdated technology terminology to showcase his experience was relevant to Rosado's qualifications for the position he sought. As we've noted, Weaver thought it important for the selectee to have current technical experience. And Rosado doesn't dispute that he used some outdated technology terminology on his résumé (for example, "AIM" and "ISSM"). Rosado's reliance on outdated technological terminology betrayed his lack of currency in the areas he mentioned.

In sum, Rosado hasn't shown that Joshua and Snead were just as or less qualified than he was for this position. And he hasn't established that unlawful discrimination "played any part" in the selection process at all. So we affirm the district court's decision to grant summary judgment for the Navy regarding Decision 3.

> 4. *Rosado failed to establish a prima facie case of unlawful discrimination or to show that unlawful discrimination otherwise "played any part" in the Navy's decision-making process for Decision 4.*

In August 2015, a mediation was being scheduled to attempt to resolve Rosado's EEO complaint about Decision 3. The mediation eventually took place in September 2015. But in anticipation of the upcoming mediation and to settle the pending EEO complaint, Freeman asked Rosado's supervisor, Wyatt Pruitt, "to talk with Mr. Rosado to see whether Mr. Rosado would be receptive to being offered a temporary promotion to GS-12 in order to gain experience, which would enable him to add this experience to his

[résumé] and allow him to be a more competitive candidate for a future promotion." Freeman says she didn't authorize Pruitt to offer Rosado a temporary promotion to GS-12.

Pruitt misunderstood. He emailed Rosado on August 10, 2015, and offered Rosado the opportunity to pursue a "cross training and temporary promotion" that might start the week of September 23, 2015. Pruitt told Rosado that he needed a few things from Rosado before the promotion could happen. Freeman received neither the August 10 email nor any follow-up emails about this matter, and Pruitt didn't discuss pursuing a temporary promotion for Rosado with Freeman after the initial conversation in August (which we discussed above). So Freeman knew nothing about Pruitt's offer to Rosado, and she never received any paperwork from Pruitt seeking her approval of a promotion for Rosado.

Meanwhile, the occupant of the GS-12 position Pruitt intended to temporarily place Rosado into never left. Still, that person had been "concentrating on learning the other functions" of the position. So Pruitt asked Rosado if he wanted to assist with the work and receive cross training. Rosado did so. But Pruitt attested that he couldn't place Rosado into the position because the position never opened during this period. And in fact, throughout the several weeks when Rosado assisted, he was not paid at the GS-12 level.

Then in September, the mediation occurred. During the mediation, Freeman proposed that she would seek authorization to temporarily promote Rosado to a GS-12 position to resolve his

EEO claim.  But Rosado declined.  He said that Pruitt had already made the same offer, and he had accepted the offer.  Freeman responded that Pruitt had no authority to make such an offer because she hadn't obtained the required approvals and authorizations.  So the most Freeman could do, she said, was offer to seek those approvals and authorizations.  When Rosado declined, Freeman took no further action.

After these events, the Navy posted the GS-12 IT Specialist position.  Rosado applied and was selected without interviews.  The Navy upgraded his position to GS-12 IT Specialist on June 16, 2016.  Freeman explained that the promotion came because she received approval to upgrade every GS-11 IT Specialist position.  Rosado was the first to be promoted.

Rosado argues that this series of events establishes discrimination against him based on race, national origin, and age discrimination.  Once again, we disagree.

For starters, no evidence in the record establishes that a GS-12 position was open at the time.  So there was nothing to apply for and nothing to be rejected from.  And for the same reason, Rosado also can't identify a comparator who received more favorable treatment.

Rosado also doesn't point to any evidence to suggest that unlawful discrimination tainted any part of Decision 4.  Rather, all evidence in the record shows that the incident arose entirely out of an unfortunate miscommunication, not unlawful discrimination.  In other words, Rosado hasn't shown that Pruitt or Freeman's

actions were motivated by Rosado's race, national origin, or age. So we affirm the district court's decision for the Navy on Decision 4.

     5.   *Rosado failed to establish a prima facie case of unlawful discrimination or to show that unlawful discrimination otherwise "played any part" in the Navy's decision-making process for Decision 5.*

As for Decision 5, Rosado contends that when he applied to be the Director of CIO3 at the GS-13 pay level in late 2017, race and age discrimination tainted Freeman's decision not to select him. We don't agree that Rosado has shown that on this record.

In December 2017, Freeman established the following criteria for the supervisory position: (1) meet the intermediate or advanced master level in cybersecurity; (2) have at least three years of GS-12 experience in performing IT duties; and (3) have experience with specific networks (NMCI or ONE-NET).

The certification list of those who met the criteria included 79 individuals. So Freeman told the human-resources department that she planned to reduce the candidates to a manageable number. Using three criteria, Freeman whittled the list down to 22, including Rosado and Anthony Joshua. Then she provided the résumés of the remaining 22 to the selection panel.

The selection panel consisted of Charlie Weaver, Ryan Hall, Luke Guthrie, and Susan Brink (who was the non-scoring EEO representative). At the time, Guthrie remained unaware of Rosado's age, although he guessed he was around 54 years old. Guthrie also

didn't know Rosado's national origin (although he believed his race was Hispanic), and he was unaware of any prior EEO activity by Rosado. Hall was unaware of Rosado's race, age, national origin, or prior EEO activity.

The panel scored the 22 résumés based on five criteria and interviewed the top ten candidates. The criteria were as follows: (1) management experience; (2) technical experience; (3) network experience; (4) policy/planning experience; and (5) certification/education. Of these, the panel weighted management experience most heavily. It gave the second-most weight to policy/planning.

Joshua scored 65.34 on his résumé, while Rosado scored 51.34. All three panelists scored Joshua's résumé higher than Rosado's. With respect to management experience, Joshua received 13 points and Rosado received 7 points. As for policy/planning, the panel gave Joshua 9 points and Rosado 5 points. Based on résumé review, Joshua ranked fifth and Rosado ranked twelfth, so Rosado was not initially eligible for an interview.

But two of the top ten candidates didn't respond for an interview. So the panel filled those interview spots with the next two highest scores. And because Rosado was the twelfth candidate, he was interviewed. In the interviews, Joshua scored an average of 79.33, while Rosado scored 56.00.

The panel then weighted the résumé scores as 40% and the interview scores as 60% of the final score. After it applied that formula, Joshua received 73.73 total points and Rosado 54.13. The

panel recommended Joshua for the position on January 19, 2018. Based on that recommendation, Freeman selected him two weeks later.

Rosado argues that he was more qualified than Joshua because he had more experience at Navy Facilities Engineering. He also asserts he had substantial supervisory experience with the Marine Corps and in his prior positions.

We disagree. Rosado again satisfies the first three elements of the prima face case. First, he is a member of a protected class. Second, he was qualified for the position, as his selection for an interview shows. And third, Joshua, the person selected, is Black and under 40, so he was outside Rosado's protected class.

But Rosado fails to meet the comparator element. Joshua scored higher on both his résumé and interview. And he did so because in the areas that mattered most for the position—management experience and policy/planning—his experience was both far more recent and more relevant than Rosado's (Joshua having just served as a supervisor at Command Information).

Not only that, but Rosado doesn't point to any other evidence to suggest that unlawful discriminatory animus "played any part" in the decision to select Joshua. So we affirm the district court's grant of summary judgment for the Navy with respect to Decision 5.

B.     Rosado did not present enough evidence for his claim of retaliation to survive summary judgment.

Rosado also argues that the district court wrongly granted summary judgment to the Navy on his retaliation claim relating to Decision 4. We begin our analysis with a review of the standards we apply in evaluating a claim of retaliation under Title VII's and the ADEA's federal-sector provisions.

To do so, we return to Title VII's and the ADEA's federal-sector provisions. Again, each states that "[a]ll personnel actions affecting employees . . . in military departments . . . shall be made free from any discrimination based on race, . . . national origin [(Title VII) or age (the ADEA)] . . . ." 42 U.S.C. § 2000e-16(a) (Title VII); 29 U.S.C. § 633a(a) (the ADEA). We have long held that "discrimination," as Title VII's federal-sector provision employs the term, includes retaliation. *See Buckley*, 97 F.4th at 798. "Because the relevant statutory provisions of the ADEA and Title VII are essentially identical," we construe them the same way. *See Babb II*, 992 F.3d at 1199–1200.

And because the same text that prohibits discrimination also prohibits retaliation, retaliation for engaging in protected conduct under Title VII or the ADEA must not "play[] any part" in any federal personnel action. *See Babb I*, 589 U.S. at 406–07; *Babb II*, 992 F.3d at 1202. So just as with a case of discrimination based on age, national origin, or race, to make out a case of retaliation under Title VII or the ADEA, a federal employee need not show that retaliation was the but-for reason for the employer's ultimate decision. *See Buckley*, 97 F.4th at 798. Rather, it's enough to establish that

retaliation somehow figured into the process that led to the final decision. *See id.*

As a result, we've said, a federal employee doesn't have to satisfy the traditional *McDonnell Douglas* framework we often use in private-sector retaliation claims. *Buckley*, 97 F.4th at 798. After all, that framework is designed to show ultimate but-for causation—a showing a federal employee need not make. *See id.* And that's a heavier weight than the law requires a federal employee to bear.

That said, if a federal employee wishes to satisfy his burden to show that retaliation tainted his employer's action by satisfying the *McDonnell Douglas* three-step framework, he may do so. Proving more than necessary to survive summary judgment on a claim of unlawful retaliation obviously proves enough to survive summary judgment on a claim of unlawful retaliation.

That leaves the question of whether, by itself, making out a prima facie case at step one of the *McDonnell Douglas* framework defeats summary judgment on a federal employee's retaliation claim. We conclude that it does.

To set out a prima facie case of retaliation, a plaintiff must establish that (1) he engaged in statutorily protected expression (here, an activity that Title VII or the ADEA protects); (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Buckley*, 97 F.4th at 798 (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)). By definition, we think this test requires a plaintiff to show that

retaliatory animus for engaging in Title VII or ADEA protected conduct tainted his employer's adverse employment action. After all, if (2) the adverse employment action was (3) causally related to (1) the statutorily protected expression he participated in, then the protected conduct necessarily played some role in the adverse employment action. And that's all the federal-sector provisions of Title VII and the ADEA require to state a claim for retaliation.

Here, there's no argument that Rosado hasn't established the first and second requirements of a prima facie case for at least Decisions 1, 2, 3, and 5. But the parties disagree about whether Rosado has fulfilled the third requirement—causation. Rosado points to two incidents and relies on the timing of Decision 4 in relation to the second incident to establish causation. We are not persuaded.

In the first incident, a few weeks after Snead and Joshua were selected as part of Decision 3, Michael Bell, the acting CIO3 IT division director, instructed Lewis Fleming and Rosado to send certain items to Cuba for another employee. Fleming emailed Bell back, asking why the other employee couldn't take care of sending the items himself. Rosado says he didn't participate in that, but Bell advised Freeman that Rosado and Lewis Fleming refused to complete a work assignment and questioned why the resource manager did not handle the task himself.

According to Freeman, based on this situation, she called a CIO staff meeting on April 1, 2015. As Rosado recalls the meeting, Freeman said, "If you don't want to be here, the door is open. I'm

tired of people walking on eggshells, I'm not going backwards, we are moving forward. I'm not afraid of EEO or the union, bring it on." Rosado says Freeman was looking at him and Fleming when she made these statements. Freeman's recollection differs slightly: she attested that she admonished the CIO staff as a group and said, "If you don't want to work, the door is open for you to leave." And she followed up with, "I'm not afraid of the EEO or the union if anyone wants to get them involved," because "they will understand that I am not asking anyone to work outside the scope of their [position description]." But in any case, Rosado conceded in his deposition that Freeman was responding to what she understood the situation to be, based on Bell's remarks to her.

The second incident was what Rosado characterizes as Freeman's refusal to process paperwork for his temporary promotion to GS-12 after Pruitt offered him the position in August 2015. In Rosado's view, Freeman refused to approve a promotion he had received (Decision 4) in retaliation for Rosado's EEO activity of participating in the mediation on his EEO complaint.

But the record doesn't establish that retaliation for protected activity tainted either of these incidents in any way.

By Rosado's own admission, Freeman made her statement during the April 1, 2015, meeting because Bell had reported to her that Fleming and Rosado had refused to complete a work assignment and had questioned why the resource manager did not handle the task himself. And she was confirming her lawful authority to require employees to perform tasks within the scope of their

duties.  In that context, her references to the EEO and the union don't show contempt for them.  Just the opposite:  Freeman was expressing confidence that she was acting in compliance with EEO and union requirements.

As for Freeman's alleged refusal to process paperwork for Rosado's purported August 2015 temporary promotion to GS-12, Rosado has identified no evidence that a position was available or that Freeman had the authority to authorize a position.  And he points to nothing to establish that Pruitt offered him the temporary promotion in the first place for any reason other than out of a non-retaliatory misunderstanding.  Rosado's contention that Freeman had the authority to approve his promotion when no vacancy existed is pure speculation.  Indeed, he cites no evidence that could allow us to conclude a material question of fact exists as to that issue.  Plus, when Freeman asked Rosado whether he wanted her to seek authorization, he declined.  To be sure, he argued that he already had the promotion, but as we've explained, the record unambiguously shows that wasn't the case.

In short, Rosado presents no evidence to suggest that retaliatory animus in any way tainted Freeman's alleged decision not to process paperwork for Rosado's promotion to GS-12 in Decision 4.  To the contrary, the record shows that there was no paperwork to process because neither a vacancy nor authorization to promote existed.

We turn next to Decisions 1, 2, 3, and 5.  To be sure, Rosado's brief mentioned in passing that he was appealing the district court's

determination that the Navy didn't retaliate with respect to those four decisions. But he made no arguments about retaliation as it relates to any of these decisions. For this reason, he abandoned any arguments that the district court erred in granting summary judgment for the Navy on his retaliation claims as they related to Decisions 1, 2, 3, and 5. *See Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 681–83 (11th Cir. 2014).

And in any case, other than invoking the April 1, 2015, incident and Freeman's alleged refusal to process promotion paperwork for Decision 4, Rosado hasn't identified any evidence to show that these four other decisions were retaliation for Rosado's EEO activity. And for the reasons we've already discussed, these two incidents just don't get Rosado there.

At bottom, Rosado has not shown that retaliatory animus "play[ed] any part" in any of the employment decisions he challenges. *Buckley*, 97 F.4th at 798. So we affirm the district court's grant of summary judgment for the Navy on the retaliation claims.

## IV.    CONCLUSION

For these reasons, we affirm the district court's grant of summary judgment for the Secretary of the Navy on all claims.

**AFFRIMED.**