[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11729

_____

JOSEPH JIMENEZ,

Plaintiff-Appellant,

*versus*

U.S. ATTORNEY GENERAL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00105-MW-MAF

_____

Before NEWSOM, BRASHER, and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Dr. Joseph Jimenez, a former medical officer for the Federal Bureau of Prisons (BOP),[1] appeals the district court's dismissal of his claims for race and national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and disability discrimination under the Rehabilitation Act, 29 U.S.C. § 794. Dr. Jimenez, who was born in Puerto Rico and identifies as Hispanic, alleged that his former employer required him to work shifts as a correctional officer, while non-Hispanic doctors were exempt. He also claimed that the BOP denied him a reasonable accommodation when it refused to exempt him from these duties, which exacerbated his mental health conditions.

The district court first dismissed Dr. Jimenez's Title VII claims based on certain adverse employment actions because he failed to administratively exhaust them. The court then granted summary judgment to the BOP on the remaining Title VII claims because Dr. Jimenez failed to show the BOP had a discriminatory or retaliatory motive for the correctional officer duty assignments. The court later dismissed Dr. Jimenez's Rehabilitation Act claim for lack of subject-matter jurisdiction, denying him an opportunity to correct what he called a "scrivener's error" in his Complaint. After careful review, and with the benefit of oral argument, we affirm the district court on all three issues.

---

[1] The Attorney General oversees the BOP as part of the Department of Justice (DOJ). *See* 18 U.S.C. § 4041.

# I.    Background

Dr. Jimenez, a medical doctor, worked for the BOP at the Federal Correctional Institution in Tallahassee (FCI Tallahassee) from November 2016 to April 2020. After serving in the Air Force and National Guard, Dr. Jimenez was diagnosed with post-traumatic stress disorder (PTSD), major depressive disorder, and anxiety. He advised the BOP he was a disabled veteran when he applied but did not provide details about his mental health issues.

As a medical officer, Dr. Jimenez's duties included providing health care to the hundreds of inmates housed at FCI Tallahassee and supervising medical support staff. Along with his medical responsibilities, Dr. Jimenez, like all BOP employees working within correctional facilities, was a "law enforcement officer." *See* 5 U.S.C. § 8331(20)(A). The medical officer job description informed candidates that "staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis." Specific correctional responsibilities included "custody and supervision of inmates" and "assuming correctional officer posts when necessary."

## A.  Augmentation Duty Assignments

As part of their correctional responsibilities, FCI Tallahassee assigned staff to cover correctional officer shifts when the facility did not have enough officers available through a process called "augmentation." Since June 2017, a Memorandum of Understanding (MOU) between the Warden and the Local Union governed

augmentation procedures for all "bargaining unit" employees at FCI Tallahassee.

According to the agreement, all non-custody staff—except Drug Abuse Program (DAP) staff, psychologists, psychiatrists, human resources managers, special investigative agents, and executive staff—would be placed on a central "augmentation roster" to complete shifts in reverse seniority order. The Operation Lieutenant's Office assigned augmentation shifts based on who was at the top of the roster, which all staff could view on a shared drive. The roster listed each staff member's name, department, start date, and date of last augmentation shift. To "ensure that all staff [were] augmented in a fair and equitable manner," once a staff member completed a shift, their name would be transferred to the bottom of the roster.

In early 2018, Dr. Jimenez learned that management planned to implement augmentation procedures while correctional officers were completing annual training. Dr. Jimenez sent a letter to the FCI Tallahassee Administration and Warden requesting that the physicians and dentists "not be burden[ed] with shift work as correctional officers." He argued that requiring the doctors to perform correctional officer duties would hinder their ability to provide medical care and noted his department was short staffed, with only one medical officer (himself), one psychiatrist, and one dentist.

Dr. Jimenez never received a response to this letter. All of the staff members in his department, including his supervisor,

Medical Director Dr. Xinyu Li, who is Asian American, and Dr. Orlando Colon, a Hispanic dentist, were assigned augmentation duties. The doctors in the Psychology Department and the psychiatrist (who worked on-site at FCI Tallahassee but reported to the BOP's Central Administrative Office) did not.[2]

Dr. Jimenez completed his assigned augmentation shifts "maybe half a dozen times." He was scheduled, but did not perform these duties, "maybe another half a dozen" times. When he was scheduled for augmentation duties, Dr. Jimenez would often call out sick to protect his mental health. Other times, he would walk into work and be surprised that he was assigned to augmentation duties.

In July 2018, Dr. Jimenez refused to go to his augmented post and FCI Tallahassee management placed him under investigation for "violating duty assignment." Later that month, he received a performance evaluation of "satisfactory," lower than his previous rating of "excellent," from his direct supervisors and others in the medical department.

### B.  Dr. Jimenez's Request for Accommodations

In September 2018, Dr. Jimenez requested that FCI Tallahassee limit his correctional duties to those incidental to his duties as a physician and exempt him from guard assignments. In support,

---

[2] Three white individuals and one Black individual worked in the Psychology Department and were exempt from augmentation. Dr. Jimenez's department, which was not exempt, also included at least three white employees.

Dr. Jimenez submitted a letter from his psychologist explaining that correctional officer duties exacerbated his PTSD, major depressive disorder, and anxiety.

Near the end of the month, FCI Tallahassee's Human Resource Manager informed Dr. Jimenez that "assuming correctional officer posts when necessary" was an essential function of his position that the BOP was not willing to eliminate. She requested "clarifying medical documentation" to help identify an accommodation that would allow him to perform augmentation duties. In response, Dr. Jimenez provided documentation from his physician showing that he had no physical limitations in performing his job duties. He did not provide any more documentation about his mental health to protect his private information. Based on this information, in November 2018, the BOP denied his accommodation request.

## C.  Contact with the EEO

Dr. Jimenez contacted the DOJ's Equal Employment Opportunity (EEO) Counselor on July 27, 2018, and filed his first charge of discrimination on August 30, 2018. Dr. Jimenez claimed the BOP discriminated against him based on his race and national origin by (1) requiring him to perform augmentation duties while non-Hispanic physicians (Dr. Sean Yutzi, a white psychiatrist, Dr. Jennifer Rogers, a white psychologist, and two other public health psychologists) were exempt; (2) giving him a lower performance log rating than in the past; and (3) placing him under investigation

for violating his duty assignment when he "attempted to get an explanation" for the disparity in assignments.

Dr. Jimenez amended his EEO charge on October 1, 2018, claiming that management subjected him to "additional harassment" during September 2018 when it assigned him to a midnight correctional shift shortly after he filed his EEO charge and because it failed to respond to his request for a reasonable accommodation. In March 2019, Dr. Jimenez emailed an EEO investigator stating he was being denied certain recruitment and retention bonuses because the Warden was attempting to "force him out." The investigator instructed Dr. Jimenez to reach out to his EEO counselor and amend his charge "as soon as possible." But Dr. Jimenez told the investigator he wanted to wait until the investigation was complete.

In December 2020, the DOJ issued its final decision. It found that the record contained no evidence linking FCI Tallahassee's actions with Dr. Jimenez's race, national origin, or disability. Instead, FCI Tallahassee required all staff who did not work in a "few select offices" to perform augmentation duties, and the MOU did not exempt Dr. Jimenez's position. And nothing indicated race or national origin played a role in those exemptions, as the exempted departments were "racially diverse." Dr. Jimenez's claim about the lower performance log rating appeared to be based "exclusively on the fact that he achieved higher performance ratings" in the past. He did not include any evidence that his ratings did not accurately reflect the quality of his work. The decision also found that the

BOP fulfilled the Rehabilitation Act's reasonable accommodation requirements.

### D. Procedural History

In February 2021, Dr. Jimenez sued the Acting Attorney General of the United States in his official capacity. His three-count Complaint alleged: (1) intentional discrimination based on national origin or race in violation of Title VII and 42 U.S.C. § 1981a; (2) discrimination based on his disability under the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, by failing to provide a reasonable accommodation; and (3) unlawful retaliation under Title VII.

To support his claims, Dr. Jimenez repeated many of the allegations from his EEO charges: the BOP required him to work "corrections duty," unlike white physicians; placed him under investigation; subjected him to "additional harassment" by altering his work schedule; and denied his request for accommodation. Dr. Jimenez's Complaint also included two new allegations: the BOP denied him recruitment bonuses in November 2018, and the BOP "had a practice of treating non-Hispanic employees more favorably" when it promoted Dr. Li, a Chinese doctor, to the medical director position instead of Dr. Jimenez "on or around March, [sic] 2019."

The district court first dismissed Dr. Jimenez's claims for Title VII discrimination and retaliation based on the denial of bonuses and incentive pay and the failure to promote him because he failed to raise them during the EEO investigation. The court then granted summary judgment to the BOP on the remaining Title VII claims.

But the court denied summary judgment on the Rehabilitation Act claim because of outstanding factual disputes.

A month later, the district court granted the BOP's motion to dismiss Dr. Jimenez's Rehabilitation Act claim for lack of subject-matter jurisdiction.[3] Monetary damages were not available under the provision he cited, 29 U.S.C. § 794, due to sovereign immunity, and injunctive relief was unavailable because Dr. Jimenez had voluntarily resigned from the BOP. The court also rejected Dr. Jimenez's attempt to salvage his complaint by filing a notice of scrivener's error or motion for leave to amend to correct the citation to 29 U.S.C. § 791. The court disagreed that Dr. Jimenez's citation to § 794 instead of § 791 was a "mere scrivener's error" and held that Dr. Jimenez did not establish "good cause" to warrant amending his complaint. Dr. Jimenez timely appealed.

## II.    Standards of Review

We review the court's dismissal of a claim for failure to exhaust administrative remedies de novo. *See Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (per curiam).

We review the district court's grant of summary judgment de novo, "construing the facts and drawing all reasonable inferences in favor of the nonmoving party." *Smelter v. S. Home Care*

---

[3] Sovereign immunity is jurisdictional. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance." *Grupo Dataflux v. Atlas Glob. Grp.*, 541 U.S. 567, 576 (2004) (quotation marks omitted).

*Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018). But "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024).

We review a district court's denial of a motion to amend a complaint for an abuse of discretion. *Smith v. Casey*, 741 F.3d 1236, 1243–44 (11th Cir. 2014). A district court's decision to enforce its pre-trial scheduling order "will not be disturbed on appeal absent an abuse of discretion." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (per curiam).

## III.    Title VII Claims

Title VII mandates that "[a]ll personnel actions . . . in executive agencies . . . be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Title VII also prohibits employers from "retaliating against their employees for opposing or seeking relief from such discrimination." *Green v. Brennan*, 578 U.S. 547, 549 (2016). Likewise, 42 U.S.C. § 1981 prohibits employers from intentionally discriminating based on race or national origin in employment contracts. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023).

An employee alleging his employer intentionally discriminated against him may pursue three "archetypal Title VII claims":

> (1) The disparate-treatment claim, *i.e.*, "a claim that an employee has suffered a tangible employment action based on race or other prohibited characteristics."

(2) The hostile-environment claim, *i.e.*, a claim stemming from mistreatment based on a protected characteristic that "is 'sufficiently severe or pervasive' that it can be said to alter the terms, conditions, or privileges of employment."

(3) The retaliation claim, *i.e.*, a claim stemming from "retaliation for protected conduct" where the mistreatment "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Babb v. Sec'y, Dep't of Veterans Affs.* (*Babb II*), 992 F.3d 1193, 1206–07 (11th Cir. 2021) (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860–62 (11th Cir. 2020)).

Dr. Jimenez raises two arguments related to his Title VII discrimination and retaliation claims. First, he argues that even if he did not explicitly raise the denial of incentive pay and failure to promote him in his EEO charges, both acts grew out of the investigation, and the "continuing violation doctrine" allows him to include them in his claim. Second, he argues that he presented enough evidence on the remaining Title VII claims that a reasonable jury could conclude that discrimination and retaliation were the real catalysts for the BOP's actions. We address each in turn.

## A.  Exhaustion

Before suing their employers for discrimination in federal court, federal employees must seek relief from the agency where the alleged discrimination occurred. 29 U.S.C. § 794a(a)(1); 42

U.S.C. § 2000e-16(b)–(c); 29 C.F.R. § 1614.105(a)(1). This require-ment allows the agency to investigate the claim internally and "try to informally resolve the matter." *Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1243 (11th Cir. 2012) (quoting 29 C.F.R. § 1614.105(a)).

A federal employee who believes that his employer discrim-inated against him must "initiate contact" with an EEO counselor at his agency "within [forty-five] days of the date of the matter al-leged to be discriminatory," or if the claim involves a "personnel action," within forty-five days of the effective date of the action. 29 C.F.R. § 1614.105(a)(1). The forty-five-day limitations period be-gins running for each discrimination claim when that claim ac-crues. *See Green*, 578 U.S. at 563.

If the employee fails to contact an EEO counselor within the applicable forty-five-day period, his claim is typically barred. *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) (per curiam). But the forty-five-day deadline "functions like a statute of limitations" and is "subject to waiver, estoppel and equitable tolling." *Hogan v. Sec'y, U.S. Dep't of Veterans Affs.*, 121 F.4th 172, 177 (11th Cir. 2024) (quotation marks omitted). The agency "shall" extend the forty-five-day deadline if the employee shows "that he or she did not know and reasonably should not have . . . known that the discrim-inatory matter . . . occurred." 29 C.F.R. § 1614.105(a)(2). An em-ployee may amend his EEO charge "to clarify and amplify allega-tions," or allege "additional acts which constitute unlawful

employment practices related to or growing out of the subject matter of the original charge." *Id.* § 1601.12(b).

For the first time before the district court, Dr. Jimenez raised two new adverse employment actions to support his Title VII claims: the BOP's denial of his bonus and incentive pay, and its failure to promote him to medical director. The denial of incentive payments occurred in November 2018, several weeks after Dr. Jimenez amended his EEO complaint, and the failure to promote him occurred several months later, in March 2019.

EEO regulations required Dr. Jimenez to contact an EEO counselor within forty-five days of learning about each "discriminatory matter" or the effective date of each "personnel action." *See id.* § 1614.105(a)(1). But Dr. Jimenez does not point to evidence that he ever initiated new EEO charges or amended the pending EEO charges to include these actions.

Dr. Jimenez's Title VII claims based on these acts appear to be time-barred and no longer actionable. *See Shiver*, 549 F.3d at 1344. He attempts to escape this conclusion by arguing that both acts "would naturally grow from DOJ's investigation" of his EEO charge and were "part of a continuing violation" of Title VII. Neither argument prevails.

### i.   *Scope of the EEO Charge*

When analyzing the degree to which a civil complaint may vary from the administrative proceedings, we must balance two competing interests. On one hand, we are "extremely reluctant to allow procedural technicalities to bar claims brought under

discrimination statutes." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (quotation marks omitted and alterations adopted). On the other, allowing plaintiffs to allege new acts of discrimination for the first time in federal court would "circumvent the entire administrative enforcement mechanism." *Ray v. Freeman*, 626 F.2d 439, 442–43 (5th Cir.1980).[4] This enforcement mechanism is "part and parcel of the congressional design" to allow federal agencies the first opportunity to investigate discriminatory employment practices. *Ramirez*, 686 F.3d at 1243 (quoting *Grier v. Sec'y of Army*, 799 F.2d 721, 724 (11th Cir. 1986)).

"To determine whether a plaintiff has exhausted her administrative remedies, then, the 'proper inquiry' is whether the 'plaintiff's complaint is like or related to, or grew out of, the allegations contained in the EEOC charge.'" *Batson*, 897 F.3d at 1328 (quoting *Gregory*, 355 F.3d at 1280) (alterations adopted). Plaintiffs may raise judicial claims that "amplify, clarify, or more clearly focus the allegations in the EEOC complaint." *Gregory*, 355 F.3d at 1279–80 (internal quotation marks omitted). But we have repeatedly "cautioned that allegations of new acts of discrimination are inappropriate." *E.g.*, *Batson*, 897 F.3d at 1327 (quotation marks omitted).

"The facts alleged in the charge matter most for determining what can reasonably be expected to grow out of an EEOC charge; the legal theory the charging party articulates is far less important."

---

[4] In *Bonner v. City of Prichard*, we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022). A plaintiff's judicial claims "may encompass any kind of discrimination like or related to the allegations contained in the charge." *Gregory*, 355 F.3d at 1280. Most commonly, we have allowed retaliation claims to move forward when plaintiffs' discrimination charges also "stated facts from which a reasonable EEOC investigator could have concluded that what [they] had complained about is retaliation." *Id.*; *Batson*, 897 F.3d at 1328; *Patterson*, 38 F.4th at 1345–46.

For example, in *Gregory*, the plaintiff's EEOC charge alleged that "shortly after being subjected to certain allegedly discriminatory acts, she was terminated." 355 F.3d at 1280. Because her charge "set forth the relevant dates of discrimination," we reasoned that the EEOC "presumably investigated" the possible reasons for her termination, which could be either discrimination or retaliation. *Id.* But language in a charge "generally alleging discrimination" is not enough to exhaust a Title VII claim for a specific discriminatory act. *Coon v. Ga. Pac. Corp.*, 829 F.2d 1563, 1568–69 (11th Cir. 1987) (finding statement in EEOC complaint alleging that "women in general are held back from advancement" in her department insufficient to exhaust separate claims for discriminatory shift assignments and training opportunities).

Here, the district court correctly held that Dr. Jimenez failed to exhaust his administrative remedies. Failing to pay bonuses and promote him are not "like or related to" the allegations of discriminatory augmentation duty assignments in his EEOC charges. *Batson*, 897 F.3d at 1328. His judicial complaint does not raise a new

"kind of discrimination" based on the factual allegations in his charge. *Gregory*, 355 F.3d at 1280. Nor do the new acts "amplify, clarify, or more clearly focus" existing factual allegations. *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989) (quotation marks omitted).

We begin with the facts alleged in Dr. Jimenez's EEO charges, which "matter most" for this inquiry. *Patterson*, 38 F.4th at 1345. The "ultimate act[s]" that Dr. Jimenez complained about in his EEO charges were the BOP requiring him to complete augmentation shifts while non-Hispanic doctors were exempt, placing him under investigation for failing to complete these shifts, giving him a lower performance review, failing to respond to his accommodation request, and altering his work schedule. *Gregory*, 355 F.3d at 1280. The "relevant dates" were between July and September 2018. *Id.* The investigation of these adverse employment actions between July and September 2018 and the possible motives behind them would not have "reasonably uncovered evidence" of two separate employment actions occurring months later—the BOP failing to promote Dr. Jimenez in November 2018 and its denial of his incentive pay in March 2019. *Id.*

Dr. Jimenez characterizes the BOP's failure to promote him to medical director as part of an "ongoing pattern of discrimination and retaliation" that would "naturally grow" from DOJ's investigation of his original and amended EEO charges. But Dr. Jimenez "inappropriate[ly]" raises "new acts of discrimination" to support existing legal theories. *Batson*, 897 F.3d at 1327. His "general claim"

that the BOP favors non-Hispanic employees cannot expand the scope of his EEO charges to include these separate instances of discrimination. *Coon*, 829 F.2d at 1568–69.

Dr. Jimenez makes much of the Final Agency Decision referencing his email to the EEO investigator about the BOP failing to pay his bonuses, arguing that this shows "these acts *were* part of the administrative investigation." While summarizing "Documentary Evidence," the decision does mention "an April 3, 2019 (sic) email from [Dr. Jimenez] to EEO Investigator Tonia Haynes," claiming that "the denial of these bonuses constitutes further attempts by management to discriminate and retaliate against him." But the decision's cursory reference to Dr. Jimenez's April 2019 email does not persuade us. Not only are the *"allegations in the EEOC complaint"* the proper focus of our inquiry, *see, e.g., Gregory*, 355 F.3d at 1279–80 (emphasis added), but the decision makes no other mention of these payments and does not analyze them as part of Dr. Jimenez's discrimination claims.

Looking to the EEO's investigation, every interview in the record began with the investigator explaining that the "subject of the interview" would be the augmentation policy, Dr. Jimenez's lower performance rating, the alteration of his work schedule, and his accommodation request. None of the BOP witnesses mentioned the denial of incentive pay or the failure to promote Dr. Jimenez to Medical Director. And the interviews took place in January and February 2019, after the denial of incentive pay would have occurred.

Finally, the BOP had no notice or opportunity to investigate these allegations. Dr. Jimenez specifically told the EEO investigator that he wanted to wait until the investigation was complete before filing a new charge based on the denial of his bonus and incentive pay. The purposes of the exhaustion requirement would be ill-served if an employee could "circumvent the entire administrative enforcement mechanism," *Ray*, 626 F.2d at 442–43, by sending an email. Especially when in that email, the employee told the investigator he did not want his current charge to include those new allegations. Under the circumstances, we decline to absolve Dr. Jimenez of his responsibility to provide "all relevant and available information" and deprive the DOJ of the opportunity to "properly investigate and consider" his claims. *Ramirez*, 686 F.3d at 1243–44.

### ii.   Continuing Violation

Dr. Jimenez also argues that the refusal to pay his incentive or bonus pay and the failure to move him into the position of medical director "grew out of an ongoing pattern of discrimination and retaliation" that amounts to a "continuing violation" of Title VII. And as a "continuing violation," he can include these untimely filed events in his timely claim.

The continuing violation doctrine allows the plaintiff to sue on otherwise time-barred claims if the "defendant's actions violate a plaintiff's rights on a repeated or ongoing basis." *Doe ex rel. Doe #6 v. Swearingen*, 51 F.4th 1295, 1305 (11th Cir. 2022). The doctrine is based on "the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of

action are or should be apparent." *Hipp v. Liberty Nat'l Life Ins.*, 252 F.3d 1208, 1222 (11th Cir. 2001) (per curiam) (quotation marks omitted).

A plaintiff "must identify more than a present harm from a past act to satisfy the continuing violation doctrine." *Doe*, 51 F.4th at 1305. For Title VII disparate-treatment claims, "the plaintiff must demonstrate deliberate discrimination within the limitations period." *Lewis v. City of Chicago*, 560 U.S. 205, 214–15 (2010). "[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (quotation marks omitted).

A continuing violation is also "a single violation of an ongoing nature," not a "a series of repeated violations that result in related harms." *Doe*, 51 F.4th at 1306 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). When "a defendant takes separate and discrete acts that repeatedly violate the law, the continuing violation doctrine does not apply." *Id.* (citing *Knight v. Columbus*, 19 F.3d 579, 580–82 (11th Cir. 1994)).

Determining whether an employee's charge is timely thus requires "identifying precisely the unlawful employment practice of which he complains." *Lewis*, 560 U.S. at 210–11 (quotation marks omitted and alterations adopted). Each discrete adverse employment decision, such as "termination, failure to promote, denial of transfer, or refusal to hire," is "a separate actionable unlawful employment practice" that starts "a new clock for filing charges

alleging that act." *Morgan*, 536 U.S. at 113–14 (quotation marks omitted). "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113.

The continuing violation doctrine cannot convert "related discrete acts into a single unlawful practice for the purposes of timely filing." *Id*. at 111. Instead, "when an employee alleges 'serial violations,' *i.e.,* a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 639 (2007), *superseded by* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5.[5] "[C]laims of discrimination based on independent discriminatory acts cannot be aggregated to extend the limitations period." *Green*, 578 U.S. at 562 n.7 (citing *Morgan*, 536 U.S. at 109–13).

But Title VII's proscriptions are not limited to "specific employment decisions with immediate consequences." *Morgan*, 536 U.S. at 115–16. For claims "based on the *cumulative* effect of individual acts," (that is, hostile work environment or constructive discharge claims), the limitations period runs from date of the last act composing the claim. *Green*, 578 U.S. at 575 (Alito, J., concurring) (quoting *Morgan*, 536 U.S. at 115).

---

[5] *See Green v. Brennan*, 578 U.S. 547, 569 n.3 (2016) (Alito, J., concurring) ("Congress has since abrogated *Ledbetter*'s precise holding in the context of 'discrimination in compensation,' but it did not disturb the reasoning of the precedents on which *Ledbetter* was based." (citation omitted)).

In *Morgan*, the Supreme Court "essentially rejected the 'continuing violation doctrine'" in Title VII claims "and simplified the law by allowing courts to view allegations of hostile work environment as 'a single unlawful employment practice.'" *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (quoting *Morgan*, 536 U.S. at 117–18). Hostile work environment claims are "continuing" by their "very nature"—they are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice." *Morgan*, 536 U.S. at 115–17 (quoting 42 U.S.C. § 2000e-5(e)(1)). Unlike discrete acts, hostile work environment claims "depend upon proof of repeated conduct extending over a period of time." *Id.* at 120 n.12. A charge alleging a hostile work environment claim will not be time barred "so long as all acts which constitute the claim are part of the same unlawful employment practice." *Id.* at 122.

The Court later applied similar reasoning to the limitations period for the "*graver* claim of hostile-environment constructive discharge." *Green*, 578 U.S. at 559 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004)). It reasoned that so long as the acts were "part of the same, single claim under consideration," the forty-five-day limitations period would only begin to run after the last act occurred (the employee's resignation). *Id.* at 556–57 (citing *Morgan*, 536 U.S. at 115–21). But the Court warned that a "timely filed constructive discharge claim could [not] resuscitate other time-lapsed claims." *Id.* at 563. The limitations period for any "separate underlying claim of discrimination" begins running "when that claim accrues." *Id.*

Even if a claim based on a discrete discriminatory act is time barred, that act may still support a timely hostile-work-environment or constructive discharge claim. *Id.* at 562 n.7. The "pivotal question" is whether the timely and untimely acts "may be fairly considered part of the same claim." *Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007). To answer this question, we look to whether the timely acts were the same type of "discriminatory intimidation, ridicule, and insult" that characterized the untimely allegations. *Id.* at 1349–50 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

A plaintiff must point to more connecting the incidents than "the identity of the employee and of the entity employing the discriminatory decisionmaker." *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 801 (11th Cir.), *opinion amended on reh'g*, 850 F.2d 1549 (11th Cir. 1988). These commonalities "will *always* exist where a Title VII plaintiff seeks relief after allowing his rights to lapse." *Id.*; *see also Morgan*, 536 U.S. at 112–13 ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." (quoting *Ricks*, 449 U.S. at 257)). Separate acts may be treated as part of the same "unlawful employment practice" if the "pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Morgan*, 536 U.S. at 120–21 (quotation marks omitted and alteration adopted).

23-11729                Opinion of the Court                    23

Here, determining whether Dr. Jimenez's charge was timely requires "identifying precisely the 'unlawful employment practice' of which he complains." *Lewis*, 560 U.S. at 210–11 (quotation marks omitted and alterations adopted). To the extent Dr. Jimenez raises "discrete claims of discrimination based on independent discriminatory acts," he cannot invoke the continuing violation doctrine "to extend the limitations period" for his claims. *Green*, 578 U.S. at 562 n.7. Despite Dr. Jimenez's attempts to characterize the failure to promote him to medical director and the denial of incentive and bonus pay as part of an ongoing "unlawful employment practice," only actionable due to their "cumulative effect," he cannot convert "related discrete acts into a single unlawful practice for the purposes of timely filing." *Morgan*, 536 U.S. at 111.

Each employment action was a separate, actionable "unlawful employment practice" regardless of its relationship to the "acts alleged in [Dr. Jimenez's] timely filed charges." *Id.* at 113–14. The "failure to promote" is "easy to identify" as a discrete discriminatory act. *Id.* at 114. And the denial of Dr. Jimenez's bonus also qualifies as a "specific employment decision[] with immediate consequences." *Id.* at 115–16. As discrete acts, each decision "occurred" on the day that it "happened," and started "a new clock for filing charges" alleging that act. *Id.* at 113.

Dr. Jimenez's argues that the district court erred by finding that the "continuing violation" doctrine did not apply because he did not assert a hostile work environment claim. But the focus of the limitations period "remains on the claim of discrimination

itself." *Green*, 578 U.S. at 561–62. It is "precisely because the entire hostile work environment encompasses a single unlawful employment practice" that an employer may be liable for both untimely and timely acts that are part of the same claim. *Morgan*, 536 U.S. at 117–18.

Unlike hostile work environment or constructive discharge claims, Dr. Jimenez's disparate treatment claims do not "depend upon proof of repeated conduct extending over a period of time." *Id*. at 115, 120 n.12. Dr. Jimenez had a "complete and present cause of action," for his "underlying claims of discrimination," and the forty-five-day clock began running, after each decision. *See Green*, 578 U.S. at 563, 556–57. By failing to file or amend his EEO charge within forty-five days after each "personnel action," Dr. Jimenez lost the ability to recover for them. *See id*. at 110; 29 C.F.R. § 1614.105(a)(1).

Even assuming the continuing violation doctrine allowed Dr. Jimenez to use these untimely discrete acts to support a timely hostile work environment claim, [6] he has not presented a

---

[6] Dr. Jimenez does not seem to dispute the court's conclusion that he "did not assert a hostile work environment claim." But his Complaint alleges both that he was "treated differently" because of his race and national origin and that the BOP "created, perpetuated and facilitated an abusive and offensive work environment." Because his amended EEO charge also alleged he was subject to "additional harassment" by being assigned more augmentation shifts, we will assume for purposes of argument that he exhausted a claim based on the "legal theory" of hostile work environment. *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022).

convincing reason to treat these acts as part of the same "unlawful employment practice." The failure to promote him and denial of incentive pay are not "sufficiently related" to his claims based on augmentation shift assignments to "be fairly considered part of the same claim." *Chambless*, 481 F.3d at 1350; *Morgan*, 536 U.S. at 120.

Dr. Jimenez does not point to commonalities suggesting the failure to promote him and denial of incentive pay are "the same type of 'discriminatory intimidation, ridicule, and insult'" as his timely allegations. *Chambless*, 481 F.3d at 1349–50. Each was a distinct employment action, that occurred only once, months apart, based on different policies and managers. *Harris*, 510 U.S. at 21; *Morgan*, 536 U.S. at 120. The only facts common to the incidents were the identity of the employee (Dr. Jimenez) and the agency employing the discriminatory decisionmaker (the BOP). These commonalities "will always exist where a Title VII plaintiff seeks relief after allowing his rights to lapse," and do not justify treating separate acts as part of the same claim. *Roberts*, 835 F.2d at 801.

Accordingly, we affirm the district court's dismissal of Dr. Jimenez's discrimination and retaliation claims based on the failure to promote him and denial of his bonus pay for failure to exhaust his administrative remedies.

### B. *Remaining Title VII Claims*

We turn to Dr. Jimenez's exhausted Title VII claims based on the BOP requiring him to perform augmentation duties, placing him under investigation for failing to complete augmentation duties, giving him lower performance log ratings, and changing his

26                    Opinion of the Court                    23-11729

work schedule. As the district court recognized, Dr. Jimenez fails to present evidence that his race, national origin, or protected activity motivated these actions.[7]

### i.  Race & National Origin Discrimination

To survive summary judgment, an employee must present "a story, supported by evidence," that would allow a reasonable

---

[7] We assume without deciding that these actions were actionable adverse employment actions. The district court, without the benefit of *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), found that the changes to Dr. Jimenez's work schedule and disciplinary investigation did not arise to the "severity of an adverse employment action." But *Muldrow* later held that the change in an employee's working conditions need not be "significant" or "serious," so long as she shows "some harm respecting an identifiable term or condition of employment." *Id.* at 353–55. This includes even "minor alterations of employment," like the employee's loss of her weekday work schedule and specialized job responsibilities in a prestigious department. *Id.* at 352, 359. With *Muldrow's* guidance, it is possible that the shift assignments and discipline could qualify as adverse employment actions if an employee shows the actions left him "worse off." *Id.* at 359.

We also note that § 2000e-16(a) refers to "personnel actions," which we have construed more narrowly than "adverse employment actions." *See, e.g.*, *Babb v. Sec'y, Dep't of Veterans Affs.* (*Babb II*), 992 F.3d 1193, 1209 (11th Cir. 2021) (holding federal employee's claim of "retaliatory hostile work environment must 'rise to the level of a personnel action'"). The list of "personnel actions" includes "'most employment-related decisions,'" such as work assignments, disciplinary action, and performance reviews. *Id.* at 1199 (quoting *Babb v. Wilkie* (*Babb I*), 589 U.S. 399, 405 (2020)). Because Dr. Jiminez's claims fail for other reasons, we do not address whether *Muldrow's* reasoning applies to the phrase "personnel actions" in § 2000e-16(a).

jury to find that the employer engaged in unlawful discrimination. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

Unlike private-sector discrimination claims, the federal-sector provision of Title VII does not "require a plaintiff to prove that unlawful discrimination was a but-for cause of adverse employment action." *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 862 (11th Cir. 2025).[8] A federal employer violates Title VII "if it allows [race or national origin] discrimination to contribute to any personnel action—even if the federal employer would have made precisely the same decision had it not engaged in [race or national origin] discrimination." *Id.* at 865 (quoting *Buckley v. Sec'y of Army*, 97 F.4th 784, 793 (11th Cir. 2024)).

Even with their lesser burden, federal employees "still must proffer evidence" that their race or national origin "played *any* part" in their employer's decision-making process. *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1352 (11th Cir. 2024) (internal quotation marks omitted and alteration adopted). That evidence may be direct, circumstantial, or both. *See Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022).

A federal employee may present circumstantial evidence using *McDonnell Douglas'* first step—the prima facie case—to support his Title VII discrimination claim. *See Rosado*, 127 F.4th at 866

---

[8] Although we no longer require federal employees to show but-for causation to survive summary judgment, but-for cause remains "important in determining the appropriate remedy." *Id.* at 1205; *see also Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1352 (11th Cir. 2024) (discussing available damages).

(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[9] We have "assum[ed] without deciding" that "a prima facie case of some type is alone enough to sustain a federal employee's discrimination claim." *Id.* at 866–67. But that prima facie case "must reasonably allow for an inference that discrimination figured into the decision-making process in some way." *Id.* at 867.

To establish a prima facie case, the plaintiff must show: (1) he belongs to a protected class, (2) he experienced an adverse employment action, (3) he was qualified to perform the job in question, and (4) his employer treated similarly situated employees outside of his class more favorably. *Tynes*, 88 F.4th at 944. The fourth step requires the plaintiff to "present evidence of a comparator— someone who is similarly situated in all material respects." *Jenkins*, 26 F.4th at 1249 (internal quotation marks omitted). A "similarly situated" comparator typically will have engaged in the same basic conduct (or misconduct); be subject to the same employment

---

[9] Because a federal employee need not establish but-for causation, he need not satisfy the full *McDonnell Douglas* framework to survive summary judgment. *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 865 (11th Cir. 2025).

We caution that *McDonnell Douglas* is not an "independent standard of liability" but "a '*procedural* device, designed only to establish an order of proof and production.'" *Tynes*, 88 F.4th at 944–45. (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993)). Absent direct evidence, the prima facie case "eliminates the most common nondiscriminatory reasons" for the employer's decision and "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981) (quotation marks omitted).

policy, guideline, or rule; have the same supervisor(s); or share the plaintiff's employment or disciplinary history. *Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019) (en banc).

The mere fact that someone outside the protected class was subject to a more favorable employment decision does not "give us enough information" to "infer that unlawful discrimination 'played any part' in the process that led to that decision." *Rosado*, 127 F.4th at 868. "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *City of Union City*, 918 F.3d at 1228.

If the federal employee has other evidence to show that discrimination "played any part" in the decision-making process, he need not present comparator evidence. *Rosado*, 127 F.4th at 867. The employee may also demonstrate a "'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *City of Union City*, 918 F.3d at 1221 n.6. A "convincing mosaic" refers to a "variety of evidence" which collectively "strongly suggest[s]" that his employer's decisions were based on his race and national origin. *Poer*, 100 F.4th at 1337. Plaintiffs may point to suspicious timing, ambiguous statements, systematically better treatment of similarly situated employees, or evidence that the employer's justification for its action is pretextual. *See Jenkins*, 26 F.4th at 1250.

No matter which framework the employee pursues, we must answer the same "ultimate question"—"whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." *Tynes*, 88 F.4th at 941. "An employer may act "for a good reason or a bad reason so long as it is not an unlawful reason." *Terrell*, 98 F.4th at 1353 (quotation marks omitted and alteration adopted). "'We do not sit as a super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quotation marks omitted).

Here, Dr. Jimenez fails to "proffer evidence" that his race or national origin "played *any* part" in the decisions to change his schedule and investigate him for failing to complete augmentation shifts. *Terrell*, 98 F.4th at 1352 (alteration adopted). Absent direct evidence, he neither presents a prima facie case nor a convincing mosaic of circumstantial evidence that would "reasonably allow for an inference that discrimination figured into the decision-making process" in any way. *Rosado*, 127 F.4th at 867–68.

Regardless of the framework, Dr. Jimenez fails to eliminate the most glaring nondiscriminatory explanation for the BOP's assignment of augmentation shifts: the April 2017 MOU exempted specific departments from augmentation duties. Those departments were composed of employees of various races. And he does

not show that the BOP deviated from that policy to target individual employees.

Beginning with the prima facie case, Dr. Jimenez has not presented a non-Hispanic comparator "similarly situated in all material respects" who was treated more favorably. *See Jenkins*, 26 F.4th at 1249. Dr. Jimenez identified several white psychologists and psychiatrists who were not required to perform prison guard duties. But the mere fact that FCI Tallahassee exempted non-Hispanic employees in other departments from augmentation duties, while Dr. Jimenez, a Hispanic employee, was required to perform them, does not "give us enough information" to "infer that unlawful discrimination 'played any part'" in the process. *Rosado*, 127 F.4th at 868.

The white psychologists and psychiatrists were far from similarly situated to Dr. Jimenez in all material respects. *See Jenkins*, 26 F.4th at 1249. They were not "subject to the same employment policies" and did not have the same supervisors. *Id.* The psychologists were exempted from augmentation duties by the MOU, and Dr. Yutzi was not a member of the union, nor subject to the agreement, because he reported to the BOP's Central Office. The doctors in Dr. Jimenez's department, who had to perform augmentation duties, were both Hispanic and non-Hispanic. And Dr. Jimenez cannot point to a single similarly situated individual outside of his protected class who engaged in the same misconduct (refusing to complete augmentation duties when assigned) and was

treated differently (not placed under investigation or assigned additional shifts).

For similar reasons, Dr. Jimenez fails to present a convincing mosaic of evidence that his race or national origin "played any part" in his scheduling assignments or discipline. *See Terrell*, 98 F.4th at 1352 (alteration adopted). He repeats his argument that the BOP treated non-Hispanic employees more favorably because white psychiatrists and psychologists were exempted from augmentation duties. But as discussed, the psychologists and psychiatrists were not similarly situated in the one "material respect" that mattered—the MOU excluded their departments from augmentation duties.

Absent a discriminatory motive, the BOP was "well within its rights" to subject employees in different departments, with different roles and supervisors, to different policies. *City of Union City*, 918 F.3d at 1228. It is "not our role to second-guess the wisdom" of FCI Tallahassee's decision to require its medical doctors, but not psychiatrists or psychologists, to perform prison guard duties. *Alvarez*, 610 F.3d at 1266. Nor is it our role to scrutinize how often FCI Tallahassee's employees were required to perform those duties.

Because Dr. Jimenez has not presented evidence from which we can infer that his race or national origin influenced the BOP's augmentation duty assignments, its investigation when he failed to complete them, or his performance review, we affirm the district court's grant of summary judgment to the BOP on his Title VII discrimination claims.

### ii. Retaliation

Section 2000e-16(a) also "directly bar[s] reprisals against federal employees who file charges of discrimination." *Babb II*, 992 F.3d at 1203 (quotation marks omitted). A prima facie case of retaliation defeats summary judgment on a federal employee's claim. *Id.* A plaintiff makes out a prima facie case of retaliation by showing that: (1) he engaged in conduct protected by Title VII; (2) he suffered an adverse employment action; and (3) "there is some causal relationship between the two events." *Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) (per curiam). Like a discrimination claim, a federal employee need not show that retaliation was the but-for cause of an employment action; it is enough "that retaliation somehow figured into the process that led to the final decision." *Rosado*, 127 F.4th at 876.

In "any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression" at the time they made the decision. *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020). But "unrebutted evidence that the decision maker did not have knowledge of the employee's protected conduct means that temporal proximity alone is insufficient." *Id.* at 1054 (internal quotation marks omitted).

A request for a reasonable accommodation is a protected activity. *See Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). But a plaintiff may not point to the denial of that reasonable accommodation as an adverse action. *Lucas v. W.W. Grainger, Inc.*, 257

F.3d 1249, 1261 (11th Cir. 2001) (explaining a plaintiff may not "re-clothe[]" a failure-to-accommodate claim as a retaliation claim). We have also declined to infer retaliation based on "suspect tim-ing" when an employee admits to "numerous acts of alleged insub-ordination" that "occurred around the same time period as [the employee's] request for accommodations." *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

Here, Dr. Jimenez's retaliation claims fail because he cannot establish that "retaliation somehow figured into" the BOP's aug-mentation duty assignments, investigation, or performance re-view. *See Rosado*, 127 F.4th at 876. The BOP could not have known about Dr. Jimenez's protected activity—his August and October 2018 EEO complaints and his September 2018 accommodation re-quest—in July 2018, when it gave him a lower job evaluation, as-signed him to augmentation duty, and investigated his failure to attend augmentation duty. *See Martin*, 959 F.3d at 1054.

Dr. Jimenez also argues that the BOP retaliated against him in September 2018 when it denied his request for accommodation and altered his work schedule to assign him additional augmenta-tion shifts. But just as in his discrimination claims, Dr. Jimenez has presented no evidence suggesting that the BOP considered any-thing other than standard augmentation duty procedures before taking these actions.

On appeal, Dr. Jimenez also argues that the BOP retaliated against him for requesting an accommodation, when it denied his request for accommodation in September 2018 and altered his

work schedule that same month. But Dr. Jimenez cannot "re-clothe[]" his failure-to-accommodate claim as a retaliation claim. *Lucas*, 257 F.3d at 1261. Nor can he support his retaliation claim based on disciplinary acts for his noncompliance with the augmentation policy that "occurred around the same time period" as his request for accommodations. *See Stewart*, 117 F.3d at 1287. As the remaining adverse acts occurring after his protected activities were not properly exhausted, his retaliation claims must fail.

We affirm the district court's grant of summary judgment on Dr. Jimenez's Title VII discrimination and retaliation claims because he fails to "proffer evidence" that his race, national origin, or protected activity "played any part" in the BOP's actions. *See Terrell*, 98 F.4th at 1352; 42 U.S.C. § 2000e-16.

## IV.    Rehabilitation Act Claims

Finally, Dr. Jimenez appeals the district court's denial of his motion to amend his Complaint to correct what he called a "scrivener's error." Dr. Jimenez maintains that the Complaint "erroneously claimed that he was filing under 29 U.S.C. § 794 *et seq.*," but he meant to file under 29 U.S.C. § 791, a different provision of the Rehabilitation Act. The district court rejected his characterization of the citation to § 794 as a "scrivener's error," and found that Dr. Jimenez did not show "good cause" to amend his complaint more than a year after the dispositive motion deadline had passed.

### A.  Scrivener's Error

Our circuit has not yet addressed a motion to correct a "scrivener's error" in a judicial complaint.[10] A "scrivener's error" is synonymous with "clerical error"—an "error resulting from a minor mistake or inadvertence and not from judicial reasoning or determination; [especially] a drafter's or typist's technical error that can be rectified without serious doubt about the correct reading." *See Error*, Black's Law Dictionary (12th ed. 2024). "Among the numberless possible examples" are "omitting an appendix from a document; typing an incorrect number; mistranscribing or omitting an obviously needed word." *Id.* In more modern parlance, a scrivener's error is an obvious typo.

Our sister circuits similarly define "scrivener's error" as "'one of transcription,' not of 'legal knowledge or analysis.'" *Sinha v. Bradley Univ.*, 995 F.3d 568, 576 (7th Cir. 2021) (quoting *United States v. Gibson*, 356 F.3d 761, 766 n.3 (7th Cir. 2004)). The error "must not be one of judgment or even of misidentification, but merely of recitation" to qualify. *United States v. Burd*, 86 F.3d 285, 288 (2d Cir. 1996) (citing *United States v. Guevremont*, 829 F.2d 423, 426 (3d Cir. 1987)). As one district court recently illustrated:

> If a person contracts to buy an authentic Picasso painting for $2 million, a typo listing the sales price as $20,000 might qualify as a scrivener's error. But if the painting turns out to be a replica even though both

---

[10] A "scrivener" is "a person whose job is to write from dictation or to copy manuscript." *Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 194 n.10 (5th Cir. 2011).

> parties thought it was the original, then mutual mistake might apply.

*Iyoha v. Architect of the Capitol*, No. CV 24-2831, 2025 WL 1393154, at *3 n. 2 (D.D.C. May 14, 2025).

Our sister circuits have also "found guidance" identifying such errors in case law applying Federal Rule of Civil Procedure 60(a) and Federal Rule of Criminal Procedure 36(a). *See, e.g.*, *United States v. Arnold*, 467 F.3d 880, 886 (5th Cir. 2006). These rules allow district courts to "correct clerical errors to reflect what was intended at the time of ruling." *Weeks v. Jones*, 100 F.3d 124, 128 (11th Cir. 1996) (per curiam). But "corrections or alterations that affect the substantial rights of the parties" are beyond their scope. *Est. of West v. Smith*, 9 F.4th 1361, 1368 (11th Cir. 2021) (quoting *Vaughter v. E. Air Lines, Inc.*, 817 F.2d 685, 689 (11th Cir. 1987) (alteration adopted)).

The "basic distinction" is that clerical mistakes are "blunders in execution," not instances "where the court *changes its mind*, either because it made a legal or factual mistake in making its original determination, or because on second thought it has decided to exercise its discretion in a manner different from the way it was exercised in the original determination." *Sartin v. McNair L. Firm PA*, 756 F.3d 259, 265 (4th Cir. 2014) (quotation marks omitted). As the Fifth Circuit explained:

> As long as the intentions of the parties are clearly defined and all the court need do is employ the judicial eraser to obliterate a mechanical or mathematical

> mistake, the modification will be allowed. If, on the other hand, cerebration or research into the law or planetary excursions into facts is required, Rule 60(a) will not be available to salvage the government's blunders.

*In re W. Texas Mktg. Corp.*, 12 F.3d 497, 504–05 (5th Cir. 1994).

The Seventh Circuit recently rejected a plaintiff's attempt to characterize a mistyped year in his EEO charge as a "scrivener's error." *Sinha*, 995 F.3d at 576. The court noted that the date came up multiple times during litigation and discovery and affected the scope of the plaintiff's EEOC charge. *Id*. But he "failed to amend or clarify his complaint despite ample opportunities to do so," until his response to the defendant's motion for summary judgment. *Id.*

Here, the district court was within its discretion to find that Dr. Jimenez's citation to § 794 instead of § 791 was not simply "a minor mistake or inadvertence . . . that can be rectified without serious doubt about the correct reading." *See Sinha*, 995 F.3d at 575–76. Dr. Jimenez argues he made "the exact same allegations under § 794 that would have been made if § 791 had been properly cited," and his claims are "consistent with a claim under § 791."

But there is "serious doubt" as to the correct reading of his Complaint. Dr. Jimenez could bring a claim for disability discrimination under either section of the Rehabilitation Act. Both § 791 and § 794 "prohibit[] federal agencies from discriminating on the basis of disability and provides judicially enforceable rights." *Ctr. v.*

*Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1300 (11th Cir. 2018) (citing 29 U.S.C. §§ 791, 794).[11]

And the choice to pursue a claim under one section or the other has legal significance because each section has its own remedial scheme. If a federal employee sues under § 791, Title VII's "remedies, procedures, and rights" apply, *see* 29 U.S.C. § 794a(a)(1), and a complaining party may "recover compensatory and punitive damages." 42 U.S.C. § 1981a(a)(2). Section 794 adopts the procedural requirements and remedies of Title VI of the Civil Rights Act of 1964. *See* 29 U.S.C. § 794a(a)(2). Employees may not recover monetary damages for claims under § 794 because Congress did not waive the government's sovereign immunity, as it did for § 791. *Lane v. Pena*, 518 U.S. 187, 192–93 (1996). Allowing Dr. Jimenez's desired modification would "affect substantial rights" of the government, by changing the remedial structure several years later. *Weeks*, 100 F.3d at 129.

Nor does Dr. Jimenez point to any conclusive evidence during litigation or discovery that both parties understood he was bringing a claim under § 791, not § 794, or that the BOP understood that he was seeking monetary damages for his failure to accommodate claim. His sole citation to the Rehabilitation Act during

---

[11] Federal employees and applicants are covered by the Rehabilitation Act, rather than the Americans with Disabilities Act (ADA). *See* 29 C.F.R. § 1614.203(b)). Liability under the Rehabilitation Act is the same as the ADA, and ADA cases serve as precedent for Rehabilitation Act cases. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

discovery was in his initial Complaint, where he cited "29 U.S.C § 794 *et seq.*" In his view, the reference to *"et seq."* includes the "damages provision" of the Rehabilitation Act, 29 U.S.C. § 794a, that should have alerted the BOP he meant to cite § 791.

At best, this reference shows that Dr. Jimenez's Complaint was not a model of precision or accuracy, not a mutual understanding that he was bringing a claim under § 791. If anything, his decision to begin his Rehabilitation Act cite at § 794 instead of § 791, even when using an all-encompassing *"et seq."* cite, could be construed as a deliberate choice to exclude § 791. As Section 794a addresses the remedial scheme for both § 791 and § 794, it does not clarify whether he was bringing a claim under § 791, § 794, or both, such that the error could be rectified without serious doubt. *See Sinha*, 995 F.3d at 575–76.

Dr. Jimenez also argues his citation of 42 U.S.C. § 1981a should have alerted the BOP he was seeking damages and meant to cite § 791. But the Complaint did not specify which statute applied to the Rehabilitation Act count versus the Title VII counts, nor did it identify an amount of damages sought for his failure-to-accommodate claim. He also sought injunctive relief, which he could have raised under either section.

Moving beyond the Complaint, nothing in discovery shows "without serious doubt" that the BOP understood that Dr. Jimenez sought damages for his Rehabilitation Act claim. *See Sinha*, 995 F.3d at 575–76. The record contains little detail about the augmentation shifts Dr. Jimenez performed and the consequences to his health,

essential information for determining damages on his failure-to-accommodate claim.

Most tellingly, Dr. Jimenez's counsel became aware of the error after the BOP alerted her that the Supreme Court's decision in *Lane v. Pena* foreclosed damages on the claim. Errors of "legal knowledge or analysis," *id.* at 576, and "misidentification," *Burd*, 86 F.3d at 288, are not clerical. Dr. Jimenez is not looking to correct an error "of transcription," *Gibson*, 356 F.3d at 766 n.3, but a separate and plausible citation to the Rehabilitation Act, only identifiable after "cerebration or research into the law," *W. Tex. Mktg. Corp.*, 12 F.3d at 504–05. The incorrect citation was no mere "blunder[] in execution," but a mutual "legal or factual mistake," *Sartin*, 756 F.3d at 265—closer to discovering your prized Picasso is a forgery after you've sold it than accidentally leaving off a zero and selling it for an absurdly low price. *See Iyoha*, 2025 WL 1393154, at *3 n. 2.

Correcting the issue would be a major alteration that would affect the BOP's "substantial rights" by exposing the agency to liability after the order dismissing the case had relieved them of liability, *Smith*, 9 F.4th at 1369, and allow Dr. Jimenez to escape dismissal for lack of subject matter jurisdiction. Although another district court might have allowed the claim to proceed, this district court was within its discretion to refuse to "employ the judicial eraser" to correct the error. *W. Tex. Mktg. Corp.*, 12 F.3d at 504–05.

## B.  Leave to Amend

The Federal Rules of Civil Procedure require district courts to issue scheduling orders that "limit the time to join other parties,

amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(3)(A). A plaintiff seeking leave to amend his complaint after the scheduling order deadline must demonstrate "good cause" and receive the judge's consent. Fed. R. Civ. P. 16(b); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241 (11th Cir. 2009) (per curiam).

The "good cause" standard "precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." *Sosa*, 133 F.3d at 1418 (quotation marks omitted). The party seeking the extension must have been "diligent in ascertaining the law before filing . . . their complaint." *Romero v. Drummond Co.*, 552 F.3d 1303, 1319 (11th Cir. 2008). The fact that a party or his counsel misunderstood the scope of established legal protections "does not constitute good cause." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008).

Here, for similar reasons, the district court did not abuse its discretion in denying Dr. Jimenez's motion to amend his complaint under Rules 15(a) and 16(b). Dr. Jimenez had years to amend his complaint from his filing in February 2021, but he waited until April 2023, after discovery and the district court's summary judgment ruling. Under Rule 15(a), Dr. Jimenez's motion for leave to amend his complaint would lead to undue delay because he filed it more than one year after the extended discovery deadline, the deadline for amendments, and the deadline for filing dispositive motions.

And under Rule 16(b), Dr. Jimenez failed to show good cause to allow him to amend his complaint after the scheduling order. Dr. Jimenez's counsel's failure to learn the difference between claims brought under § 791 and § 794, does not establish the requisite level of diligence, nor good cause to allow Dr. Jimenez to amend his complaint. *See Oravec*, 527 F.3d at 1232. The district court did not abuse its discretion in denying Dr. Jimenez's motion for leave to amend.

## V. Conclusion

The district court's dismissal of Dr. Jimenez's Title VII and Rehabilitation Act claims is **AFFIRMED.**